# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA

### CASE NO. _____

JOSEPH MONOPOLI, JAMES FITZPATRICK,
SYNTHIA PRAGLIN, and SAWNTANAIA
HARRIS on behalf of themselves
and all others similarly situated,

     Plaintiffs,                                **CLASS ACTION**

v.

                                            **JURY TRIAL DEMANDED**

MERCEDES-BENZ USA, LLC and DAIMLER AG,

     Defendants.

_____/

## CLASS ACTION COMPLAINT

Plaintiffs Joseph Monopoli, James Fitzpatrick, Synthia Praglin, and Sawntanaia Harris file this class action complaint on behalf of themselves and all others similarly situated against Defendants Mercedes-Benz USA, LLC, ("MBUSA"), and Daimler AG ("Daimler") (together referred to herein as "Mercedes" or the "Mercedes Defendants"), and allege as follows:

### I.    INTRODUCTION

1.    For more than a decade, Mercedes has been designing, manufacturing, advertising, selling, and leasing cars with headrests containing a defect which threatens occupants' safety.  Embedded in the headrest is a mechanism, known as

an "Active Head Restraint" ("AHR"), which is designed to spring forward in the event of a rear-end collision and rapidly push the headrest out to catch the occupant's head and prevent whiplash. The headrest and AHR are manufactured by a German company, Grammer AG ("Grammer"), and installed in Mercedes vehicles. The AHR was designed by Grammer and Daimler. Mercedes has branded the AHR in its vehicles as "NECK-PRO."

2.      All NECK-PRO AHRs share a common, uniform defect. Under normal conditions, the NECK-PRO restraint can deploy without warning or any external force from a collision, and forcefully strike the back of the occupant's head. The force of the impact not only causes serious bodily harm to the head and neck, but also creates a risk of collision when the headrest deploys—suddenly and without warning—while the vehicle is being driven.

3.      The AHR spontaneously deploys when, under normal operating conditions, a cheap plastic component inside the device fails. A plastic bracket acts as the triggering mechanism for the AHR and holds the spring-loaded release in place until a sensor alerts signaling a rear-end collision. As a cost-saving measure, Daimler designed this bracket with an inferior and inexpensive form of plastic which cracks and breaks down prematurely under the constant pressure exerted by the tensed springs in the AHR. Mercedes vehicles equipped with the defective NECK-

PRO in the United States (the "Class Vehicles") number at least in the hundreds of thousands, and there is no way for a vehicle owner to predict when the AHR in the headrest will deploy.

4.     The defective AHR is a "safety-related defect," as defined by the National Highway and Traffic Safety Administration (NHTSA). Specifically, NHTSA states that examples of defects related to safety include:

> Car seats and booster seats that contain defective safety belts, buckles, or *components* that create a risk of injury not only in a vehicle crash, but also in the nonoperational safety of a motor vehicle.[1] (emphasis added).

5.     NHTSA also defines safety-related defects to include "[s]eats and/or seat backs that fail unexpectedly during normal use."[2]

6.     Information regarding the defective AHR and the safety hazard it poses to vehicle occupants was, until recently, in the exclusive possession of Defendants and was not provided to Plaintiffs and Class members, who could not reasonably discover the defect through due diligence.

---

[1] *See*             https://www.nhtsa.gov/sites/nhtsa.dot.gov/files/documents/14218-mvsdefectsandrecalls_041619-v2-tag.pdf.

[2]  Motor Vehicles and Safety Defects:  What Every Owner Should Know, available at https://www-odi.nhtsa.dot.gov/recalls/recallprocess.cfm.

7.      Defendants became aware of this safety defect as early as 2006 based on, among other things, engineering design reports, pre-production testing, pre-production design failure mode analyses, manufacturing and design validation reports, plastic aging tests, plastic material data reports, consumer complaints to NHTSA, consumer complaints to MBUSA dealerships, consumer complaints on website forums, aggregate warranty data compiled from MBUSA dealerships, and repair orders and parts data received from dealerships.  Defendants were intimately involved in the design and testing of the AHR systems and were aware that they were designed with an inferior, inexpensive, plastic that cannot withstand the constant force applied by the springs.

8.      Despite this exclusive and superior knowledge, the Mercedes Defendants continued to direct and approve the defective AHRs for use in their vehicles, and continued to distribute the Class Vehicles to their dealers, and dealers continued to sell Class Vehicles with the defective AHR.  Defendants have conspired to conceal the defect from and have failed to disclose the existence of the defect to Plaintiffs, Class members, and the public.  Additionally, the Mercedes Defendants have refused to issue a recall, remedy the defect, or compensate Plaintiffs and the Class members for their damages.

9.      Mercedes also has knowledge of the defect because the same defective

AHR system that it incorporates into the Class Vehicles, manufactured by Grammer, has been the subject of class action lawsuits against Fiat-Chrysler, the first of which was filed in California in February 2018.[3]  In that matter, Defendant FCA US LLC related to the court that NHTSA opened an investigation on September 9, 2019 entitled "Active Headrest Inadvertent Deployment," in which NHTSA is reviewing reports of AHRs inadvertently deploying in Fiat-Chrysler vehicles. (*See Alger*, No. 18-cv-360, D.E. 114, *see also*, NHTSA Preliminary Evaluation 19-014).

10.     Despite knowing of the dangers of the poorly designed bracket and the cheap materials used, Defendants have taken no action to correct the problem and continue to manufacture, sell or lease, knowingly misrepresent as safe, and fail to disclose the safety hazard in vehicles containing the defective NECK-PRO. Mercedes has not issued a recall or made any attempt to notify Mercedes owners of the defect.  To the contrary, when presented with deployed, defective headrests, Mercedes refuses to cover any out-of-warranty costs of replacing the defective AHR, instead blaming the consumer and disclaiming any responsibility.

11.     Mercedes has attempted to conceal the defect by blaming the

---

[3] *See Alger v. FCA US LLC*, No. 2:18-cv-00360 (E.D. Cal.). Daimler merged with Chrysler in 1998, but then sold 80.1% of its interest in Chrysler to General Motors in 2007. Chrysler then merged with Fiat after filing for bankruptcy in 2009.

spontaneous deployments on other issues.  In a Service Bulletin sent to NHTSA and Mercedes dealerships, MBUSA acknowledged that the "active head restraints activate for no reason" and then falsely represented that "this may be caused by damage to the seat wiring harness causing a short circuit."  On the contrary, through, among other things, warranty and repair reports and communications with its dealers, Mercedes has at all relevant times been aware of the real issue: the AHR was designed with an inferior, inappropriate, and inexpensive plastic component that breaks under the tensed force of the springs.

12.     In fact, Defendant MBUSA has a pattern of concealment when it comes to defects in its vehicles.  Indeed, MBUSA's conduct in regard to safety recalls has resulted in "the motoring public not being able to access safety critical information about their MBUSA vehicles and/or confusion over whether a safety recall applies to their vehicle."[4]

13.     In an annual audit in 2017, NHTSA issued MBUSA a list of deficiencies found in MBUSA's 2017 recall files. These deficiencies included numerous recalls in which MBUSA failed to timely notify owners of recalls of their

---

[4] National Highway Traffic Safety Administration Letter to Thomas Brenner, Mercedes-Benz USA, LLC, re: Audit of Safety Recall Campaign Administration (AW18-004), 1 (October 22, 2018).

vehicles and omitted critical information from recalls, including failing to identify the estimated percentage of vehicles impacted.  NHTSA stated that MBUSA was "preventing NHTSA from fully assessing the safety risk involved and frustrating the agency's oversight responsibilities."[5]

14.    Based on the conduct uncovered through the audit, MBUSA entered into a settlement agreement with NHTSA on December 17, 2019, under which MBUSA will pay $23 million in civil fines assessed pursuant to the Safety Act, 49 U.S.C. § 30165.[6]

15.    Consumers rely on automobile manufacturers to design, manufacture, market, and sell vehicles that are safe and protect against the risk of bodily injury. Consumers do not expect vehicle manufacturers to make or install products that increase the risk of injury or malfunction while the vehicle is in ordinary use.  When Plaintiffs and the Class members purchased or leased their Class Vehicles, they reasonably relied on the reasonable expectation that the Class Vehicles would be free from defects and that Defendants would not design, manufacture, and sell the AHR with an inherent safety risk to occupants simply to enrich themselves through

---

[5] *Id*.

[6] Audit Query 18-004, Settlement Agreement, 4.

a cost-saving measure.

16.     As a direct result of the defective AHR and Defendants' fraudulent concealment thereof, Plaintiffs and Class members did not receive the benefits of their bargains and have been harmed and suffered actual damages, including overpayment for their Class Vehicle, loss of use of their Class Vehicle, costs and lost time associated with bringing in their Class Vehicle for diagnosis, repair, and replacement of components, and the actual costs of diagnosis, repair, and replacement components to address or repair the defective AHR.

17.     This lawsuit is intended to compel Defendants to notify owners of all affected vehicles of the defect in the AHR; to repair and replace the defective and dangerous headrests; and to compensate Class members for their losses arising from the defect.

18.     There are no differences among the NECK-PRO headrests installed in the various Mercedes vehicle models.

## II.     PARTIES, JURISDICTION, AND VENUE

### Plaintiffs

### *Joseph Monopoli*

19.     Plaintiff Joseph Monopoli is a New York citizen residing in East Setauket, New York 11733. He is a natural person over the age of twenty-one, and

otherwise *sui juris*.

20.    Plaintiff Monopoli owns a 2011 GL450s, which he purchased used from European Automobile Club in Plainview, New York in April 2017.  This model of Mercedes is equipped with headrests containing the defective AHR.

21.    When Plaintiff Monopoli purchased his Class Vehicle, he was unaware that it contained the defective AHR.  Plaintiff Monopoli bought his vehicle, and paid a premium price, because he trusted Mercedes to provide high-quality and safe automobiles.  Prior to purchasing the vehicle, Plaintiff Monopoli was aware of, reviewed, or heard Mercedes' warranties and advertisements publicizing its reputation for safety and reliability. These materials and advertisements did not disclose either that Mercedes had installed the Grammer headrests with the defective AHR or that the vehicle was not, in fact, fit for everyday use. The value of Mr. Monopoli's vehicle has been diminished as a result of the defective NECK-PRO. Had Mercedes disclosed the AHR defect, he would not have purchased his vehicle, or would not have paid as much for it as he did.

### James Fitzpatrick

22.    Plaintiff James Fitzpatrick is a North Carolina citizen residing at 44 Tynecastle Drive, Banner Elk, North Carolina 28604.  He is a natural person over the age of twenty-one, and otherwise *sui juris*.

23.    Plaintiff Fitzpatrick owns a 2009 R320, which he purchased used in 2018 from High County Auto Sales in Boone, North Carolina.  This model of Mercedes is equipped with headrests containing the defective AHR.

24.    When Plaintiff Fitzpatrick purchased his Class Vehicle, he was unaware that it contained the defective AHR. Plaintiff Fitzpatrick bought his vehicle, and paid a premium price, because he trusted Mercedes to provide high-quality and safe automobiles. Prior to purchasing the vehicle, Plaintiff Fitzpatrick was aware of, reviewed, or heard Mercedes' warranties and advertisements publicizing its reputation for safety and reliability. These materials and advertisements did not disclose either that Mercedes had installed the Grammer headrests with the defective AHR or that the vehicle was not, in fact, fit for everyday use.  The value of Mr. Fitzpatrick's vehicle has been diminished as a result of the defective NECK-PRO. Had Mercedes disclosed the AHR defect, he would not have purchased his vehicle, or would not have paid as much for it as he did.

### Synthia Praglin

25.    Plaintiff Synthia Praglin is a California citizen residing at 2345 Mandeville Cyn Road, Los Angeles, California 90049.  She is a natural person over the age of twenty-one, and otherwise *sui juris*.

26.    Plaintiff Praglin owns a 2014 C250, which she purchased used in

November 2016 from Mercedes of Santa Monica, California operating as an agent of Mercedes.  This model of Mercedes is equipped with headrests containing the defective AHR.

27.     When Plaintiff Praglin purchased her Class Vehicle, she was unaware that it contained the defective AHR. Plaintiff Praglin bought her vehicle, and paid a premium price, because she trusted Mercedes to provide high-quality and safe automobiles.  Prior to purchasing the vehicle, Praglin was aware of, reviewed, or heard Mercedes' warranties and advertisements publicizing its reputation for safety and reliability.  These materials and advertisements did not disclose either that Mercedes had installed the Grammer headrests with the defective AHR or that the vehicle was not, in fact, fit for everyday use.  The value of Ms. Praglin's vehicle has been diminished as a result of the defective NECK-PRO. Had Mercedes disclosed the AHR defect, she would not have purchased her vehicle, or would not have paid as much for it as she did.

### *Sawntanaia Harris*

28.     Plaintiff Sawntanaia Harris is a California citizen residing at 43244 Yaffa Street, Lancaster, California 93535.  She is a natural person over the age of twenty-one, and otherwise *sui juris*.

29.     Ms. Harris owns a 2016 CLS400, which she purchased used from

11

Mercedes-Benz of Calabasas, operating as an agent of Mercedes-Benz, in June 2019. This model of Mercedes is equipped with headrests containing the defective AHR.

30.     In November 2019, while driving on the highway at approximately 75 miles an hour, the defective AHR in Ms. Harris's vehicle deployed and struck her in the back of the head.  Ms. Harris's car was not in a collision and the headrest deployed due to the inherent defect in the AHR.

31.     Ms. Harris brought her vehicle into the dealership and was at first told that the vehicle must have been in an accident.  Ultimately, the service director at the dealership admitted that no accident had occurred, and that Ms. Harris had experienced an uncommanded deployment.

32.     Ms. Harris bought her vehicle, and paid a premium price, because she trusted Mercedes to provide high-quality and safe automobiles. Prior to purchasing the vehicle, Harris was aware of, reviewed, or heard Mercedes' warranties and advertisements publicizing its reputation for safety and reliability.  These materials and advertisements did not disclose either that Mercedes had installed the Grammer headrests with the defective AHR or that the vehicle was not, in fact, fit for everyday use.  The value of Harris's vehicle has been diminished as a result of the defective NECK-PRO.  Had Mercedes disclosed the AHR defect, she would not have purchased her vehicle, or would not have paid as much for it as she did.

**All Plaintiffs and Class Members**

33.   None of the advertisements reviewed or representations received by Plaintiffs or Class members included any mention or disclosure of the defective AHR and its associated safety hazard. Had Defendants disclosed that the Class Vehicles contained the AHR defect and the associated safety hazard, Plaintiffs and Class members would have not purchased or leased their Class Vehicles, or they would have paid significantly less for their respective vehicles.

34.   When Plaintiffs and Class members purchased or leased their Class Vehicles, they relied on the reasonable expectation that the Class Vehicles would be equipped with an AHR that was free from defects, safe to operate, and would not pose a threat to their safety or the safety of occupants or other drivers.  In fact, Defendants have always emphasized the quality and reliability of the Class Vehicles, knowing that consumers, including Plaintiffs and Class members, rely upon such representations when purchasing or leasing vehicles. Had Defendants disclosed that the defective AHR in the Class Vehicles could spontaneously and dangerously deploy during normal use of the car, posing a safety hazard to vehicle occupants and other drivers, Plaintiffs and Class members would not have purchased or leased their Class Vehicles or would have paid significantly less for their respective vehicles.

35.    Plaintiffs and Class members operated their Class Vehicles in a reasonably foreseeable manner and as the Class Vehicles were intended to be used. Plaintiffs and the Class members have suffered an ascertainable loss as a result of Defendants' unfair and deceptive conduct, breach of common law and statutory duties, and omissions and misrepresentations associated with the defective AHR and its associated safety hazard, including but not limited to, out-of-pocket losses and diminished value of their vehicles.

36.    Neither Defendants nor any of their agents, dealers, or other representatives informed Plaintiffs and Class members of the AHR defect and its associated safety hazard prior to Plaintiffs' and Class members' purchase or lease of the Class Vehicles.

37.    There are no material differences between Plaintiffs' facts and those of the putative Class members.  Each Plaintiff and putative Class member owns or leases a Class Vehicle with the defective NECK-PRO system. Each Plaintiff and putative Class member was similarly damaged by Defendants because they did not receive the benefit of their bargain and purchased or leased Class Vehicles that are of a lesser standard, grade, or quality than represented.  Defendants possessed superior and exclusive knowledge of the AHR design and knew, should have known, or recklessly disregarded the fact, that the AHR system in the headrests were

defective but concealed this knowledge from the public, Plaintiffs, and the putative Class members, and instead marketed the Class Vehicles as safe, reliable, and defect-free.

38.     Each Plaintiff and putative Class member was deprived of having a defect-free headrest installed in their vehicle and Defendants have been, and are being to this day, unjustly enriched from their unconscionable delay in repairing or replacing the headrests and/or issuing a recall (and thereby saving the cost of a recall) on the defective NECK-PRO headrests.

**Defendants**

*MBUSA*

39.     Defendant MBUSA is a corporation doing business in every state and the District of Columbia and is organized under Delaware law with its principal place of business at One Mercedes-Benz Drive, Sandy Springs, Georgia 30328.  MBUSA employs more than 1,600 workers in the United States.

40.     At all relevant times, MBUSA, directly or through its agents, manufactured, distributed, warranted, sold, and leased the Class Vehicles throughout the United States and in this District.  Further, MBUSA, directly or through its agents, marketed and promoted the sale of the Class Vehicles throughout the United States and in this District including through the advertising campaigns described in

paragraphs 103-114 of this complaint.

41.   MBUSA approved and installed the defective NECK-PRO in the Class Vehicles and approved and publicized marketing and advertising designed to sell the Class Vehicles as equipped with an AHR as a feature for "Occupant Safety." MBUSA sold Class Vehicles with the defective AHR in all fifty states, including Georgia.

42.   Daimler is MBUSA's parent corporation.  Daimler and MBUSA are collectively referred to herein as "Mercedes" or the "Mercedes Defendants." MBUSA is a wholly owned subsidiary of Daimler and engages in business, including the advertising, marketing, and sale of Mercedes-Benz automobiles, including Class Vehicles, in all fifty states, in furtherance of Daimler's interests.

43.   MBUSA is Daimler's principal North American subsidiary, headquartered in Sandy Springs, Georgia.  As its subsidiary, MBUSA renders services on behalf of Daimler that are important to Daimler and its sale of Mercedes-Benz vehicles in the United States.  If MBUSA did not exist or was not performing those services, Daimler would perform the services itself so it could sell vehicles within the United States.  Daimler controls the public name and brand of MBUSA and the NECK-PRO head restraints.  In consumer transactions, like those with Plaintiffs, Daimler's unified brand and logo serve as its and MBUSA's official seal

and signature as to consumers.

44.     There are approximately 380 authorized Mercedes dealerships in the United States.  In 2020 alone, Daimler and MBUSA sold more than 325,000 vehicles in the United States. Daimler established MBUSA expressly for the purpose of targeting the United States market.  Daimler, directly or indirectly, through MBUSA and other agents (Mercedes-branded dealerships) has sold hundreds of thousands of cars, including the Class Vehicles, to consumers, including Plaintiffs, in the United States.

45.     Authorized Mercedes dealerships operate as agents of the Mercedes Defendants. Technicians, mechanics, and other employees receive their initial job training from Mercedes-Benz at training facilities; technicians follow instructions published and disseminated by MBUSA when diagnosing and repairing vehicle issues; service managers' report to MBUSA each time a fault is detected in a vehicle brought in for service or repair; and MBUSA approves or denies payment for services and repairs provided under warranty.

46.     MBUSA's purposeful conduct availing itself of the market in the United States and this District resulted in the sale of Class Vehicles to Plaintiffs and the damages Plaintiffs suffered.  If not for MBUSA's distribution and promotion of Class Vehicles in the United States and this District, Plaintiffs could not and would

not have purchased Class Vehicles or suffered the resulting damages.

### *Daimler*

47.    Defendant Daimler Aktiengesellschaft is a foreign corporation headquartered in Stuttgart, Baden-Wurttemberg, Germany. Daimler develops, manufactures, markets, and sells Mercedes-Benz vehicles around the world, including in the United States. Daimler manufactured and designed the Class Vehicles specifically for sale in the United States.

48.    Daimler markets itself to American consumers as Mercedes-Benz, a single entity, and purposely avails itself of the United States automobile market. For example, Daimler uses a Daimler Twitter account to market and advertise Mercedes-Benz brands and to tout MBUSA's economic impact on, and physical presence in the United States. MBUSA is a wholly owned subsidiary of Daimler, and is located in Sandy Springs, Georgia. Daimler also advertises its connection to Georgia on its website, representing that its own "Brunswick, GA Vehicle Preparation Center (VPC) is one of five VPC facilities in the U.S. that serve as the first stop for new Mercedes-Benz vehicles destined for Mercedes-Benz dealerships throughout the United States."[7]

---

[7] *See* https://www.daimler.com/career/about-us/locations/location-detail-page-329605.html.

49.     MBUSA   and   Daimler   engineered,   designed,   developed,   and manufactured the Class Vehicles, and approved and installed the Defective NECK-PRO headrest for use in the Class Vehicles and for sale in the United States and this District.    They also developed, reviewed, and approved the marketing and advertising campaigns designed to promote the NECK-PRO system and sell the Class Vehicles in the United States and this District.

50.     Importantly, Daimler – and not MBUSA – is the registrar and owns all rights, title, and interest in U.S. Trademark Registration No. 3,026,206 for NECK-PRO.

51.     During the relevant period, Daimler continuously engaged in business in the United States by, among other things, exercising control over and interacting with its wholly owned subsidiaries in the United States, including MBUSA, and developing, reviewing, and approving the marketing and advertising campaigns designed to sell Mercedes-Benz-branded automobiles in the United States. The relationship between Daimler and MBUSA is governed by a General Distributor Agreement that gives Daimler the right to control nearly every aspect of MBUSA's operations—including sales, marketing, management policies, and warranty terms. Daimler has, and at all relevant times had, the contractual right to exercise, and has in practice exercised, control over MBUSA's marketing, the scope of its written

warranties, and representations made, and facts withheld from consumers and the public about the AHR defect in Class Vehicles.

52.   Daimler uses MBUSA as its alter ego for all purposes in the United States, including for sales and marketing of the Class Vehicles and for ongoing management of relationships with owners and lessees of the Class Vehicles.

53.   Daimler established MBUSA as its wholly owned subsidiary in Sandy Springs, Georgia, and exerts close control over its actions.  Daimler provides MBUSA with marketing and technical materials and, in practice, avoids any distinction between it and MBUSA.  Daimler does not distinguish between itself and MBUSA for purposes of selling and leasing Mercedes-branded vehicles and providing related services in the United States.

54.   Daimler exerts control over the daily affairs of MBUSA through, *inter alia*: requiring weekly reports to be sent from the U.S. to Germany so that German supervisors can oversee U.S. work; conducting regular meetings held at U.S. facilities, including in Georgia, to direct activities and establish policies; and directing the method of promotions for workers at MBUSA. Daimler also regularly implements common policies for MBUSA and other U.S. agents by installing Daimler executives at U.S. affiliates, including in Georgia.

55.   Daimler exercises control over the work of MBUSA with respect to the

manner of Class Vehicles' marketing and representations in the United States and this District concerning the defective NECK-PRO headrests including but not limited to the decision not to issue a recall for the headrests despite prior knowledge of the defect, and including but not limited to the advertising campaigns described in paragraphs 103-114 of this complaint. Daimler operates MBUSA with a unity of interest and ownership such that MBUSA is a mere instrumentality of Daimler. MBUSA and Daimler engage in the same business enterprise and share common board members and employees.

56.    Daimler worked together with MBUSA to develop the owner's manuals, warranty booklets, product brochures, advertisements, and other promotional materials relating to the NECK-PRO system and the sale of Class Vehicles in the United States, with the intent that these materials or advertisements be distributed in all fifty states and caused those materials or advertisements to be disseminated throughout the United States and the Northern District of Georgia.

57.    Daimler controls MBUSA as its alter ego through, *inter alia*, Daimler's Board of Management, which is the ultimate body responsible for managing the Daimler Group, an operating unit identified by Daimler that includes MBUSA. As Daimler acknowledges in its annual report, Daimler's Board of Management establishes sales and other targets and requirements for its subsidiaries in the

Daimler Group, including MBUSA.

58.    Daimler acknowledged in a recent annual report that the United States is a key sales market.  Daimler purposefully avails itself of the U.S. automotive market because its sales to the United States are voluntary, intentional, and regular.

59.    Daimler designed and/or manufactured the Class Vehicles, including Plaintiffs' vehicles, for sale in the United States and this District.  The United States and each state therein have a collection of federal and state laws that require manufacturers to build their passenger vehicles specifically to meet the standards established by those laws.  Daimler specifically designed Plaintiffs' Class Vehicles in an attempt to meet federal and state regulations and standards, including the Federal Motor Vehicle Safety Standards.

60.    Daimler supervisors certified to U.S. government officials that the Class Vehicles met U.S. federal requirements and standards so that the vehicles could be sold in the United States. Daimler further instituted means for marketing and advertising Class Vehicles and the NECK-PRO system and providing instruction to owners and lessees of Class Vehicles, including Plaintiffs, in the United States and this District by licensing its trademarks to dealerships and authorizing dealerships to sell its vehicles.

61.    Daimler marketed the Class Vehicles through MBUSA, which agreed

to serve as a sales agent for Daimler in the United States.

62.     Daimler, directly or indirectly, engaged in the financing of authorized dealerships throughout the United States and this District.

63.     Daimler, through its alter ego MBUSA, established and/or managed the distribution network for Mercedes vehicles that brought Class Vehicles to the United States and this District for sale or lease.

64.     Daimler, through its affiliates including MBUSA, was involved in providing information to train personnel in the United States and this District in the repair, servicing, and preparation of Class Vehicles.

65.     Daimler directed, managed, or funded nationwide advertising campaigns that were intended to reach consumers in the United States and this District and that marketed not only the NECK-PRO headrests but also the alleged safety and reliability of Class Vehicles.  None of these advertisements or marketing materials disclosed that the NECK-PRO headrests were designed with inappropriate and inexpensive plastic or were defective.

66.     From 2004 through the present, Daimler, through MBUSA, regularly communicated with authorized dealerships in the United States and this District to facilitate the sale and service of Class Vehicles, including Plaintiffs' vehicles.

67.     From 2004 through the present, employees, managers, and officers of

Daimler regularly travelled to the United States and this District to facilitate the sale and service of Mercedes vehicles, including Class Vehicles and Plaintiffs' vehicles.

68.     Daimler's website, from 2005 through the present, has been accessible and accessed in the United States and this District. Through the website, Daimler solicits the sale of Mercedes vehicles and connects U.S. customers with its agents – the Mercedes authorized dealers.

69.     Daimler, through MBUSA, solicited the sale or lease of Class Vehicles, including Plaintiffs' vehicles, in the United States and this District.

70.     Daimler owns all rights, title, and interest in U.S. Trademark Registration No. 657,386 for MERCEDES-BENZ, which is a word mark for goods including automobiles, motor trucks, and parts thereof.  The MERCEDES-BENZ mark was registered on January 21, 1958, based on a corresponding German trademark registered on October 10, 1927. Daimler has registered and maintains the registrations with the U.S. government for the trademark design of its distinctive emblem, the three-pointed star.

71.     Daimler identified the United States as one of its "most important markets" and referred to "our customers" to include U.S. customers.[8]  In 2015, the

---

[8] *See* Daimler AG, 2015 Annual Report.

U.S. was the second-largest market for Mercedes-Benz vehicle sales.[9]

72.     Daimler licenses the use of the Mercedes trademarks to MBUSA to promote the sale of Mercedes-Benz vehicles in the United States and this District.

73.     Daimler's purposeful conduct availing itself of the market in the United States and this District resulted in the sale of Class Vehicles to Plaintiffs and the damages Plaintiffs suffered.  If not for Daimler's conduct designing, manufacturing, distributing, and promoting Class Vehicles for sale in the United States and this District, Plaintiffs could not and would not have purchased Class Vehicles or suffered the resulting damages.

**Relevant Nonparties**

***Grammer***

74.     Grammer AG is a foreign for-profit corporation with its principal place of business in Amberg, Germany. Grammer develops and manufactures automotive interior components including headrests, armrests, and center consoles which purchasing companies such as the Mercedes Defendants then install in their vehicles that are sold throughout the United States.

75.     Grammer manufactures (and, with Daimler, designed) the headrests

---

[9] *Id.*

that include the defective AHR and supplies them to the Mercedes Defendants for installation in the Class Vehicles.

### *Mercedes-Benz Dealerships*

76.    Mercedes-Benz dealers sold, leased, and serviced the Class Vehicles containing the defective AHR, when they knew, should have known, or recklessly disregarded the fact that the Class Vehicles contained the defective AHR.  Upon information and belief, when presented with an uncommanded deployment, dealers misrepresented that the problem with the AHR was caused by an external force or some other issue and not caused by a defect when they knew or should have known these representations were false and only induced consumers to spend more money to have diagnostics run on their vehicle and/or replace the defective AHR with another headrest containing the same defective AHR.

### **Jurisdiction and Venue**

77.    This Court has original jurisdiction over this class action pursuant to the Class Action Fairness Act ("CAFA") and 28 U.S.C. § 1332(d) because members of the proposed Class are citizens of states different from MBUSA's home state of Georgia, and Daimler's home country of Germany, and upon information and belief the total amount in controversy in this action exceeds $5,000,000 exclusive of interest and costs.  Jurisdiction is also proper in this Court under 28 U.S.C. § 1331

because Plaintiffs bring federal Magnuson-Moss claims. This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

78.    This Court has personal jurisdiction over MBUSA because it has its principal place of business in Georgia.

79.    This Court has personal jurisdiction over Daimler pursuant to O.C.G.A. § 9-10-91 (1)(a)(1), (2), and (3) because Daimler, directly or through agents, transacts business in Georgia; committed tortious acts and omissions in Georgia; and committed tortious injuries in this state caused by acts or omissions outside Georgia and regularly does or solicits business, and derives substantial revenue from goods used or consumed or services rendered in this Georgia.

80.    Georgia has significant contacts with the Mercedes Defendants, as MBUSA is headquartered in Georgia and there are at least eleven MBUSA dealerships in Georgia. MBUSA dealerships are agents or alter egos of the Mercedes Defendants.

81.    Daimler is MBUSA's corporate parent, overseeing MBUSA's operations in its headquarters in Sandy Springs, Georgia and throughout the United States.

82.    Daimler's Brunswick, GA Vehicle Preparation Center ("VPC") is one of five VPC facilities in the U.S. that serve as the first stop for new Mercedes-Benz

vehicles destined for Mercedes-Benz dealerships throughout the United States. The Brunswick VPC is strategically port-located to processes vehicles headed for Mercedes-Benz dealerships throughout the Southern Region. The Brunswick VPC performs vehicle inspections, factory campaigns, full paint and body, and mechanical repairs.

83.     Mercedes' purposeful availment of Georgia renders the exercise of jurisdiction by this Court over them and their respective affiliated or related entities permissible under traditional notions of fair play and substantial justice.

84.     In the alternative, this Court has personal jurisdiction over Daimler under Fed. R. Civ. P. 4(k)(2) with respect to Plaintiffs' federal claim, and under supplemental or pendant jurisdiction with respect to Plaintiffs' state law claims.

85.     As alleged above and throughout the Complaint, Daimler has purposefully availed itself of the privileges and laws of the United States as a whole. Daimler has not submitted itself to personal jurisdiction in a single, particular forum.

86.     Daimler has purposefully availed itself of the United States automotive market by producing and selling certain classes of Mercedes vehicles, including Class Vehicles, specifically intended to be sold in the United States. Daimler uses its American subsidiary – MBUSA – as its means for selling, marketing, and warranting Class Vehicles in the United States and this District and has set up

distribution chains and taken other affirmative measures to make its vehicles, including Class Vehicles, available to consumers in the United States and this District, thereby availing itself of the benefits and protections of conducting business in the United States.

87.    Plaintiffs' claims arise out of the Mercedes Defendants' contacts with the United States, including within this District.  Plaintiffs could not have purchased the Class Vehicles with the defective NECK-PRO headrest if not for these Defendants' intentional acts of designing and installing the defective AHR systems and exporting them for sale to customers in the United States.

88.    Venue is proper in this forum pursuant to 28 U.S.C. § 1391 because Defendants are subject to personal jurisdiction in this district. MBUSA has its headquarters here, both of the Mercedes Defendants transact business in Georgia, and a substantial portion of the practices, events, and omissions complained of herein occurred in this District.

89.    All conditions precedent to this action have occurred, been performed, or have been waived.

### III.    <u>FACTUAL ALLEGATIONS</u>

**<u>Background</u>**

90.    Since 2006, Mercedes has advertised, distributed, leased, and sold

numerous Class Vehicle models equipped with headrests containing the defective AHR while simultaneously publicizing and promoting the safety of its vehicles.

91.    Mercedes has intentionally cultivated, and long enjoyed, a reputation for manufacturing top-of-the-line vehicles.  The Mercedes brand slogan is "Das Beste oder Nichts," which translates to "the best, or nothing."  And yet, when Mercedes introduced active head restraint technology to its vehicles, that commitment to "the best or nothing" was compromised.  As a cost-saving measure Mercedes approved the use of an inexpensive, inferior, and inappropriate plastic material for key components of the AHR in the headrests produced by Grammer, sacrificing the level of quality that customers expect and for which they pay a premium.

92.    Mercedes and Grammer had exclusive and superior knowledge that the cheap plastic used in the AHR could not withstand the constant pressure being applied by the tensed springs and would fail under ordinary use but failed to disclose this to Plaintiffs and the Class members. Consumers, relying on Mercedes' longstanding reputation for quality vehicles, paid heightened prices for Class Vehicles that pose a serious and unpredictable risk of injury to drivers, occupants, and the public because of the defective AHR designed and installed by Mercedes.

93.    The AHR is marketed as a critical safety device for preventing or

reducing cervical injuries, such as whiplash, during rear-end collisions.   It is designed to propel the headrest forwards, towards the head, to cushion and arrest the abrupt backward movement of the driver's or passenger's head after impact.

94.   The internal components of the defective AHR are the same across all Mercedes Class Vehicles: the forward-facing padded surface of the headrest is mounted to a plastic carriage that is loaded by pre-tensioned springs when stowed in the headrest prior to deployment.   The carriage is secured in the stowed position by a pin-and-hook latch assembly. The pin is secured in a nest in the carriage and the latch, in turn, is linked to the vehicle's electronic computer control unit.   When the control unit detects a rear-end collision exceeding some threshold of severity, a signal triggers the pin-and-hook latch to release the pin allowing the carriage to be forced forward by the springs and rapidly deploying the face of the headrest forward. Below is an illustration of the AHR system before it has deployed:



95.     When a vehicle is involved in a rear-end collision, the device propels the face of the headrest forward by 40 millimeters and upwards by 30 millimeters, to meet the head as it travels backwards. The device fully deploys in .027 seconds. This is known as a commanded deployment; it is the intended function of the AHR.

96.     However, rather than operating as intended, Mercedes' defective NECK-PRO is substantially certain to malfunction and poses a serious risk of harm.

The crucial internal component that restrains the AHR is the plastic carriage that is secured by the latch pin against the force of the compressed springs.  As a cost-saving measure by Defendants, the bracket keeping the pin in place, ostensibly until a rear-end collision is sensed, is made from a low-quality, inexpensive plastic called Acrylonitrile Butadiene Styrene, or ABS. ABS is a lightweight, recyclable, thermoplastic polymer with relatively cheap production costs.  The two linear springs continuously exert a combined 75 pounds of force on that ABS plastic bracket at all times.  As early as 2006, Defendants had the exclusive and superior knowledge, and concealed their knowledge, that this particular plastic used cannot withstand the constant pressure and is prone to cracking and breaking, allowing the pin to be released from the carriage, rather than from the latch, and spontaneously deploying the headrest even when the vehicle has not been involved in a rear-end collision.  The image below illustrates the AHR system after the plastic has broken and the AHR has randomly deployed.



97.     When the plastic breaks down, the carriage deploys at random—rather than only in a rear-end collision—suddenly striking the driver or passenger in the back of the head.  The AHR deploys the headrest at a rate of 12 miles per hour, or nearly 18 inches per second, impacting the back of the passenger's head with enough force to cause serious injuries.[10]  Deployment can occur at any time, including while

---

[10]  *See, e.g.*,  https://abc7chicago.com/automotive/woman-claims-vehicle-headrest-sent-her-to-hospital/5746392/ (December 11, 2019 news report out of Illinois regarding a 2012 Mercedes-Benz GLK 350 that spontaneously deployed and caused a woman head injuries sending her to the hospital).

the vehicle is driving on highways or public roads. *See infra* ¶¶ 170, 179.

98.     Inspection of headrests in which the defective AHR has randomly deployed reveals how the AHR will deploy when *not* commanded by the vehicle's computer sensor.  The latch and pin assembly remain engaged, but when the plastic bracket that holds the pin fails and breaks under the strain of the pent-up spring tension, it causes the springs to release and deploy the AHR *without* the hooks releasing the pin.

99.     One can determine, through visual inspection, whether a deployment was commanded or uncommanded.  Because the hooks retract in a commanded deployment, an intact hook-and-pin assembly (as well as the broken plastic) indicates that an uncommanded deployment has occurred.

100.   No reasonable consumer expects to purchase or lease a vehicle with a defective AHR that exposes them to a serious safety hazard. Further, Plaintiffs and Class members do not reasonably expect Defendants to conceal a defect in the Class Vehicles or conceal a known safety hazard.  Plaintiffs and Class members had no reasonable way to know that Class Vehicles contained the defective AHRs, which were defective in materials, workmanship, design, and/or manufacture, and posed a serious and real safety hazard.

101.   As a result of Defendants' material misrepresentations and omissions,

including Defendants' failure to disclose that the Class Vehicles contain a defective AHR, Plaintiffs and Class members paid more for their Class Vehicles than they would have and suffered other actual damages, including but not limited to out-of-pocket expenses and the diminished value of their vehicles.  The defective AHR in the headrests installed by Mercedes makes the Class Vehicles unsafe to drive and Plaintiffs and putative Class members would not have purchased, or would have paid less, for the Class Vehicles had they known of the defect.

### Mercedes Markets the AHR as a Safety Feature

102.   Mercedes uses the brand name NECK-PRO to identify the AHR installed in its vehicle headrests.

103.   Mercedes emphasizes the safety of vehicle occupants in its advertising materials. On the MBUSA website, Mercedes currently advertises "Luxury through peace of mind," and states that "To deliver the best or nothing, safety must come first. It's why we devote so much time to a moment we hope never happens, and why every Mercedes-Benz is engineered to make an accident less severe, less damaging, and even less likely." The website further represents: "Protecting drivers and passengers has always been our priority, and with every innovation, that legacy

continues."[11]

104.   Mercedes specifically encourages consumers to rely on the safety of its vehicles: "No matter what Mercedes-Benz you're driving, you can always have confidence that it will be backed by some of the most reliable safety features in the industry."[12]

105.   From the earliest introduction of NECK-PRO in 2005, Mercedes has never disclosed the defect and instead emphasized its purported safety benefits and held out to consumers that Mercedes includes NECK-PRO in its vehicles for the benefit of passengers: "With the new NECK-PRO head restraints, Mercedes-Benz is making a further important contribution to occupant safety."[13]

106.   According to a Mercedes-Benz manual on passive safety systems:

The NECK-PRO head restraints are connected to an electronic control unit, which evaluates the longitudinal deceleration or acceleration of the vehicle at the start of a collision. If the control unit detects a rear collision that exceeds a certain severity threshold, pretensioned springs inside the head restraints are triggered. The release of these springs

---

[11] https://www.mbusa.com/en/best-or-nothing/safety.

[12] https://www.mbcharlotte.com/mercedes-benz-safety-features.html.

[13] https://media.daimler.com/marsMediaSite/en/instance/ko/NECK-PRO-crash-responsive-head-restraints-standard-in-four-Mercedes-model-series.xhtml?oid=9918459.

moves the head restraint forward and upward toward the seated occupant. The head of the occupant is then supported early on in the collision, which can significantly reduce the strain on the cervical vertebrae and associated muscles and soft tissue.[14]

107.   In brochures advertising its various vehicles, Mercedes has represented that NECK-PRO is a safety feature designed for the benefit of consumers.   For example, both 2012 and 2014 C-Class brochures state that "in a rear impact, NECK-PRO active front head restraints help to prevent whiplash."[15]

108.   In a brochure advertising features of the 2009 R-Class line, Mercedes stated that NECK-PRO was created "to support the heads of the driver and front passenger in the event of a rear-end collision," and that "[w]hen sensors detect an impact, pre-tensioned springs bring [the occupant's] head restraint forward to reduce the risk of whiplash."[16]

109.   Likewise, in a brochure for the 2011 GL-Class, Mercedes advertised to consumers that "Mercedes-Benz has blazed new trails in safety engineering for more than half a century . . . The GL-Class doesn't just look into the future. It looks out

---

[14] Mercedes Benz, *Passive Safety Systems: Advanced Engineering for Protection During and After an Accident*, 18 (2018).

[15] Mercedes-Benz, *2012 C-Class Sedan and Coupe*, 14 (2011); Mercedes-Benz, *2014 C-Class Sedan and Coupe*, 18 (2013).

[16] Mercedes-Benz, *2009 R-Class Sedan and Coupe*, 12 (2008).

for yours."[17]

110.   The owner's manuals Mercedes provides with the Class Vehicles make specific claims about when and how NECK-PRO is supposed to deploy. In relevant owner's manuals, Mercedes represents that NECK-PRO is intended to deploy *in the event of a rear end collision*, not otherwise:

- In the event of a rear-end collision, the active head restraints on the driver's and front passenger's seats are designed to move forward in the direction of travel, providing the head with increased support earlier on in the collision sequence. The active head restraints move forward whether the seat is occupied or not.[18]

- In the event of a rear collision of a certain severity, the head restraints on the driver's and the front-passenger seats are moved forwards and upwards. This provides better head support.[19]

- … [T]he NECK-PRO head restraints on the driver's and front-passenger seats are moved forwards and upwards in the event of a rear-end collision of a certain severity. This provides better head support.[20]

- In the event of a rear collision of a certain severity, the NECK-PRO

---

17 Mercedes-Benz, *2011 GL-Class Sedan and Coupe*, 9 (2010).

[18] Mercedes-Benz 2006 C-Class Owner's Manual, p. 73 and Mercedes-Benz 2009 R-Class Owner's Manual, p. 64.

[19] Mercedes-Benz 2011 C-Class Owner's Manual, p. 49.

[20] Mercedes-Benz 2012 E-Class Owner's Manual, p. 49 and Mercedes-Benz 2011 GL-Class Owner's Manual, p. 52.

head restraints/NECK-PRO luxury head restraints on the driver's and front-passenger seats are move forwards and upwards. This provides better head support.[21]

- In the event of a rear-end collision, the NECK-PRO active front head restraints are designed to move forward and up in the direction of travel. They thus provide the head with increased support earlier on in the collision sequence. The NECK-PRO active front head restraints will move forward and up whether the seats are occupied or not.[22]

- In the event of a rear-end collision, the NECK-PRO active front head restraints on the front seats are designed to move forward in the direction of travel, they thus provide the head with increased support earlier on in the collision sequence. The NECK-PRO active front head restraints will move forward whether the seats are occupied or not.[23]

111.   The owner's manuals Mercedes provides with the Class Vehicles make specific claims about protection from head and neck injuries afforded by NECK-PRO:

- The active head restraint are [sic] intended to offer the driver and front passenger increased protection from head and neck injury.[24]

- The NECK-PRO head restraints increase protection for the driver's

---

[21] Mercedes-Benz 2013 C-Class Owner's Manual, p. 50 and Mercedes-Benz 2014 C-Class Owner's Manual, p. 53.

[22] Mercedes-Benz 2010 E-Class Owner's Manual, p. 54.

[23] Mercedes-Benz 2010 C-Class Owner's Manual, p. 52.

[24] Mercedes-Benz 2006 C-Class Owner's Manual, p. 73.

and front-passenger's head and neck.[25]

- The NECK-PRO head restraints increase protection to the driver's and front- passenger's head and neck.[26]

- NECK-PRO head restraints/NECK-PRO luxury head restraints increase protection of the driver's and front-passenger's head and neck.[27]

- The active head restraints are intended to offer the driver and front passenger increased protection from whiplash-type injuries.[28]

- The NECK-PRO active front head restraints are intended to offer the driver and front passenger increased protection from whiplash-type injuries.[29]

112.   The brochure on Mercedes' Passive Safety Systems also claims that the

NECK-PRO reduces cervical-spine injuries:

- The crash-responsive NECK-PRO active head restraints for the driver and front passenger are standard equipment in many Mercedes-Benz models. This important safety feature improves the protection of the front occupants during a rear impact by reducing

---

[25] Mercedes-Benz 2011 C-Class Owner's Manual, p. 49.

[26] Mercedes-Benz 2012 E-Class Owner's Manual, p. 49 and Mercedes-Benz 2011 G-Class Owner's Manual, p. 52.

[27] Mercedes-Benz 2013 C-Class Owner's Manual, p. 50 and Mercedes-Benz 2014 C-Class Owner's Manual, p. 53.

[28] Mercedes-Benz 2009 R-Class Owner's Manual, p. 64.

[29] Mercedes-Benz 2010 C-Class Owner's Manual, p. 52.

the risk that the occupant will experience whiplash injury . . .
Through the targeted design of the front seats and their head
restraints, an exceptional level of protection can be achieved, even
in purely passive systems that are provided in some Mercedes-Benz
models. In the event of a rear impact, the occupant is pushed deeper
into the seat cushion by inertia. If the head restraint is correctly
adjusted, the head and upper body are accelerated simultaneously
and the cervical vertebrae are spared.[30]

113.   Mercedes advertises the NECK-PRO as being carefully calibrated to
deploy at the appropriate time, that is, in the case of a collision.  A Mercedes blog
post states that "on detection of an imminent collision of a pre-defined impact
severity, either rear end or head-on, springs inside the head rest are released allowing
the frontal movement of the headrest."[31]

114.   Likewise, Daimler states that "if the sensor system detects a rear-end
collision of a predefined degree of severity, it releases pre-tensioned springs inside
the head restraints, causing the latter to move forwards."[32]

115.   Mercedes' manuals, advertisements, and other public statements

_____

[30] Mercedes-Benz, *Passive Safety Systems: Advanced Engineering for Protection During and After an Accident*, 18 (2018).

[31] Nathalie Godoy, Mercedes-Benz NECK-PRO Head Restraints Technology (May 20, 2016), https://www.mercedes-benz-brampton.ca/mercedes-benzs-neck-pro-head-restraints-technology/.

[32] NECK-PRO: crash-responsive head restraints standard in four Mercedes model series, https://media.daimler.com/marsMediaSite/ko/en/9918459.

highlight the ideal, intended function of NECK-PRO: a safety device that protects vehicle occupants during a collision.  However, due to the low-cost plastic used to manufacture the bracket holding the AHR rod in place, the reality is that the AHR in the headrest poses a risk of injury to drivers, passengers, pedestrians, and occupants of surrounding vehicles because the AHR deploys unpredictably, when no external force has occurred.

116.   Despite Defendants' exclusive and superior knowledge, none of Mercedes manuals, advertisements, or other public statements disclosed the fact that the AHR was defective and could spontaneously deploy during the normal operation of the car.  Mercedes manuals, advertisements, and other public statements were intended to conceal this fact from Plaintiffs, Class members, and the public.

**NECK-PRO Exhibits a Common Uniform Defect**

117.   Grammer manufacturers the headrests with the defective AHR that Mercedes installs in the Class Vehicles.  As stated above, the plastic bracket in the AHR is made from the inexpensive and inferior ABS plastic.  ABS is frequently used for inexpensive consumer products such as children's toys, plastic kitchen utensils, and faceplates for electric outlets.

118.   ABS is unsuitable for use in the AHR, as it does not withstand fatigue well.  The resistance to the stored potential force of the two compressed springs in

the AHR creates continuous pressure which, over time, inevitably leads to what is known as a "plastic creep" and eventually to component failure. ABS is prone to tell-tale "stress-whitening," where the cracking is occurring, allowing one to see where the plastic's integrity has been compromised and where the plastic will break and cause the headrest to deploy spontaneously.

119.   Pictured below is an exemplar NECK-PRO headrest that is showing signs of this stress-whitening due the force of the tensed springs:



120.   The ABS plastic will break solely due to the force of the springs but is even more susceptible to failure in severe hot and cold weather.

121.   What is even more egregious about the use of this inexpensive and inferior plastic is that other components of the headrest were designed with a fiber-glass reinforced plastic which is much more durable and stronger and would be capable of withstanding the constant force of the springs.

122.   Despite their awareness of the safety issues caused by a sudden and unexpected AHR deployment, being further aware of plastic material that should have been used in the design, and being on notice that the NECK-PRO has a dangerous safety defect, the Defendants refuse to warn customers, issue a recall, or take responsibility for repairing or replacing the NECK-PRO headrests in the Class Vehicles.  Instead, Defendants conspired to conceal the fact and nature of the defect from Plaintiffs, Class members, and the public and continue to sell and distribute Class Vehicles equipped with the defective AHR.

**<u>Defendants' Knowledge of the AHR Defect and Associated Safety Hazard</u>**

123.   Based on engineering design reports, pre-production testing, pre-production design failure mode analyses, manufacturing and design validation reports, plastic aging tests, ABS plastic material data reports, consumer complaints to NHTSA, consumer complaints to MBUSA dealerships and on website forums,

aggregate warranty data compiled from MBUSA dealerships, repair order and parts data received from dealerships, amongst other things, Defendants have known since at least 2006 that the AHR was made with an inferior plastic that could not withstand the pressure it was exposed to and would prematurely fail during normal use of the vehicle.

124.   Mercedes, Grammer, and dealers possessed exclusive and superior knowledge and information regarding the defective AHR, but concealed the defect and its associated safety hazard from Plaintiffs and Class members.

125.   Defendants fraudulently and intentionally omitted and concealed from Plaintiffs and Class members the defective AHR in the Class Vehicles, even though Defendants knew or should have known of the design and/or manufacturing defects in the Class Vehicles.

126.   Defendants knew or should have known that the AHR defect and its associated safety hazards were material to owners and lessees of the Class Vehicles and that Plaintiffs and Class members did not know or could not reasonably discover the AHR defect before they purchased or leased Class Vehicles or before the warranties on their Class Vehicles expired.

127.   Notwithstanding Defendants' exclusive and superior knowledge of the defective AHRs, Defendants failed to disclose the defect to consumers, including

46

Plaintiffs and Class members, at the time of purchase or lease of the Class Vehicles (or any time thereafter) and continued to install the defective AHRs in certain Class Vehicles up until the 2018 models.   Defendants knowingly and intentionally concealed the AHR defect and associated safety hazard and failed to provide any notice of the defect and associated safety hazard to Plaintiffs and Class members. Mercedes also failed to recall the Class Vehicles to remedy the AHR defect.

128.   Indeed, at all relevant times, in advertisements, promotional materials, and other representations, Mercedes continuously maintained that the Class Vehicles were safe and reliable, while uniformly omitting any reference to the AHR defect. Plaintiffs, directly or indirectly, viewed or heard such advertisements, promotional materials, or representations prior to purchasing or leasing their Class Vehicles.  The misleading statements and omissions about the Class Vehicles' safety and reliability in the Mercedes Defendants' advertisements, promotional materials, and representations were material to Plaintiffs' and Class members' decision to purchase or lease the Class Vehicles.

### *Pre-Production Testing*

129.   Mercedes' knowledge of the AHR defect arose first from testing performed on the AHR and its component parts. Vehicle manufacturers perform various pre-production tests on new vehicle components including Failure Modes

and Effects Analyses (FMEA), Finite Element Analyses (FEA), and Time to Creep

Failure Analyses (or ASTM D2990 Plastic Creep Testing ). These tests are standard

tests in the automotive industry for new parts.

130.   The FMEA test assesses methods or modes by which a particular

component might fail. It examines the materials used in each component, the

assembly of the part, and whether use in various manners would cause the part to

fail. For example, in testing the NECK-PRO, FMEA testing would ask, among other

things, how and under what conditions the ABS plastic used for the bracket might

fail, how likely failure was under different conditions, and how likely each condition

tested was to occur. If properly performed, FMEA testing here would have revealed

that the ABS plastic used in the NECK-PRO was susceptible to creep under the

degree of pressure consistently exerted upon it, and would ultimately fail through

normal operation of the Class Vehicles.

131.   The FEA assessment tests look at the design of a vehicle's component

parts and, in this case, would have tested the stress factors on the NECK-PRO's

plastic components and assessed at what point the pressure exerted on the plastic

components would cause failure.  If properly performed, FEA testing here would

have revealed that the ABS plastic used in the NECK-PRO was susceptible to creep

under the degree of pressure consistently exerted upon it, and would ultimately fail

through normal operation of the Class Vehicles.

132.   The Plastic Creep Test examines the service life of plastic components subjected to a static load, and would have tested whether the plastic components in the NECK-PRO could withstand the constant force exerted on it by the springs in the AHR. If properly performed, Plastic Creep Testing would have performed revealed that the ABS plastic used in the NECK-PRO was susceptible to creep under the degree of pressure consistently exerted upon it, and would ultimately fail through normal operation of the Class Vehicles.

133.   Upon information and belief, Mercedes performed these tests on the NECK-PRO headrests in the Class Vehicles and, if performed with due care, each of these tests demonstrated that the use of the cheap inferior plastic would lead to failure.

### *NHTSA Complaints*

134.   Consumers who purchased or leased Class Vehicles have filed complaints with NHTSA, reporting and detailing the defective AHR in the Class Vehicles.

135.   Federal law requires the Mercedes Defendants to monitor defects that can cause a safety issue and report them within five days to NHTSA.  MBUSA regularly monitors NHTSA complaints in order to meet reporting requirements under

federal law and were, therefore, provided information and knowledge of the defective

AHR through these complaints, as well as by other means.

136.  As detailed above, the NECK-PRO headrests were designed and

manufactured with an inferior and inexpensive plastic and as can be seen by

consumer complaints made to NHTSA, have created issues with uncommanded

deployments for years. A sample of those complaints follows:

a.   **Consumer Complaint – NHTSA ID Number: 763519**
**2011 Mercedes-Benz E350**
**Date Complaint Filed: 09/16/2013**
**Date of Incident: 09/14/2013**

I WAS DRIVING DOWN THE ROAD ON LAYTON AVE AND 43RD
STREET, AND OUT OF NOWHERE THE HEADRESTS OF THE
VEHICLE EXPLODED, PUSHING MY NECK FORWARD. GRANTED I
WENT OVER A HOLE NOT THAT BIG BUT THE EXPLOSION WAS SO
DRASTIC THAT IT PUSHED MY SEAT FORWARD AND MY NECK IS
NOW SORE AND TENDER FROM THE IMPACT. I AM REALLY SCARE
[sic] NOW THAT THIS CAN HAPPEN ANYWHERE. I CALLED
MERCEDES BENZ DEALERSHIP AND THEY SAID THAT THEY
WANT ME TO BRING THE CAR SO THE [sic] CAN RESET THE
SYSTEM. I DON'T LIKE THAT IDEA BECAUSE I GOT THIS CAR
BRAND NEW AND NOW THE VALUE REALLY CHANGE. I DON'T
FEEL SAFE IN IT ANYMORE. I DON'T THINK MERCEDES IS
WILLING TO TAKE THE CAR BACK EITHER. SHOULD I FOLLOW
[sic] A LAWSUIT? I HAVE 5 MONTHS LEFT ON THIS LEASE BUT
ANYTHING CAN HAPPEN WITH THIS CAR NOW SINCE ALREADY
SHOWED SOME MALFUNCTION. HEADRESTS ARE SUPPOSED TO
POP OUT ONLY YOU ARE REAR ENDED. *TR

b.   **Consumer Complaint – NHTSA ID Number: 10680958**
**2014 Mercedes-Benz E350**

**Date Complaint Filed: 02/03/2015**
**Date of Incident: 12/17/2014**

TL* THE CONTACT OWNS A 2014 MERCEDES BENZ E350. THE
CONTACT STATED THAT WHILE THE VEHICLE WAS PARKED, THE
HEAD REST DEPLOYED WITHOUT WARNING. THE VEHICLE WAS
TOWED TO A DEALER BUT WAS NOT DIAGNOSED OR REPAIRED.
THE MANUFACTURER WAS NOTIFIED OF THE FAILURE.

c.      **Consumer Complaint – NHTSA ID Number: 10683033**
**2006 Mercedes-Benz CLS500**
**Date Complaint Filed: 02/12/2015**
**Date of Incident: 10/16/2014**

TL* THE CONTACT OWNS A 2006 MERCEDES BENZ CLS500 WHILE
THE VEHICLE WAS PARKED, THE FRONT PASSENGER SEAT HEAD
REST INADVERTENTLY DEPLOYED WITHOUT ANY IMPACT TO
THE VEHICLE. THE FRONT PASSENGER SEAT OCCUPANT
SUSTAINED SEVERE HEAD AND NECK INJURIES, AND SUFFERED
FROM CONSTANT HEADACHES WHICH REQUIRED MEDICAL
ATTENTION. THE VEHICLE WAS EQUIPPED WITH A HEAD
RESTRAINT DEPLOYMENT MECHANISM. THE VEHICLE WAS
TAKEN TO THE DEALER FOR DIAGNOSTIC TESTING, BUT WAS
NOT REPAIRED. THE MANUFACTURER WAS NOT NOTIFIED OF
THE ISSUE.

d.      **Consumer Complaint – NHTSA ID Number: 10695029**
**2012 Mercedes-Benz GLK350**
**Date Complaint Filed: 03/18/2015**
**Date of Incident: 03/11/2015**

WE HAVE 2012 MERCEDES BENZ GLK350 BOUGHT FROM NANUET
MERCEDES BENZ, NANUET, NY. ON MARCH 11 DRIVING ON RTE
306S AND HIT A POT HOLE COVERED WITH WATER AT ABOUT 20
MPH. THE HEAD REST SPLIT APART AND HIT MY NECK. IF I WERE
DRIVING 40 OR MORE MILES PER HOUR THAT IMPACT WOULD
HAVE BROKEN MY NECK EVEN COULD CAUSE DEATH. WAS

THERE ANY SIMILAR COMPLAINT? SOMETHING LIKE THIS DID NOT HAPPEN IN 43 YEARS OF MY DRIVING. IS THE CAR MANUFACTURER LIABLE FOR IT? I TOOK THE CAR TO THE DEALER AND IT WOULD COST $600. [ ] *TR

e.    **Consumer Complaint – NHTSA ID Number: 11233810**
**2011 Mercedes-Benz C300**
**Date Complaint Filed: 07/22/2019**
**Date of Incident: 02/01/2016**

TL* THE CONTACT OWNS A 2011 MERCEDES BENZ C300 WHILE THE VEHICLE WAS PARKED, THE HEADREST AIR BAGS BURST ON THEIR OWN WITHOUT WARNING. THE CONTACT STATED THAT AN UNKNOWN WARNING INDICATOR ILLUMINATED ON THE INSTRUMENT PANEL. THE VEHICLE WAS TAKEN TO W.I. SIMONSON MERCEDES-BENZ [ ] BUT WAS NOT DIAGNOSED OR REPAIRED. THE MANUFACTURER WAS NOTIFIED.

f.    **Consumer Complaint – NHTSA ID Number: 11230531**
**2011 Mercedes-Benz C300**
**Date Complaint Filed: 07/09/2019**
**Date of Incident: 02/01/2019**

TL* THE CONTACT OWNS A 2011 MERCEDES-BENZ C300. WHILE DRIVING, THE PASSENGER SIDE HEADREST AIR BAG DEPLOYED WITHOUT WARNING OR IMPACT. THERE WERE NO INJURIES. THE AIR BAG INDICATOR ILLUMINATED AFTER THE AIR BAG DEPLOYED. THE VEHICLE WAS DRIVEN TO AN INDEPENDENT MECHANIC, BUT THE CAUSE OF THE FAILURE COULD NOT BE DIAGNOSED. THE VEHICLE WAS NOT REPAIRED.

g.    **Consumer Complaint – NHTSA ID Number: 10898815**
**2009 Mercedes-Benz C300**
**Date Complaint Filed: 03/30/2018**
**Date of Incident: 04/18/2016**

2009 MERCEDES BENZ C300. CONSUMER WRITES IN REGARDS TO

PART OF THE SRS CONTROL UNIT WAS REPAIR [sic]. HEAD REST UNIT DEPLOYED WHILE DRIVING AND REPLACEMENT PARTS NOT AVAILABLE TO REPAIR AIRBAG RECALL. *SMD *TR

### *Consumer Complaints*

137.   Mercedes vehicle owners have also shared their experiences with the

AHR defect on websites devoted to Mercedes vehicles, which, upon information and

belief, the Mercedes Defendants are aware of and regularly review.

138.   Examples of these consumer complaints include:[33]

•      3/03/13 – Today, while driving my son and his friend to the park, I was suddenly struck in the back of the head by my headrest. I pulled over and stopped my car and could see the headrest on my 2010 GLK 350 had literally exploded? Has this ever happened to anyone???

•      03/06/13 – The Mercedes dealership has had my car for 3 days now. They are saying that they need to have an engineer look at it to try to figure out why the head rest exploded hitting me in the back of the head. I was going no more than 15 mph and didn't experience any kind of bump or impact? I don't have confidence in my car. What if it happens to me again on the freeway? My neck is still sore and I have tenderness where the head rest hit. If this is a safety mechanism that is supposed to deploy in an accident . . . I don't know if I want something hitting me in the back of my head that hard while trying to avoid getting smashed in the fact by a deploying airbag from my steering wheel?

•      04/07/13 – My 2010 GLK headrest exploded and was not preceded by any accidents, bumps, etc. I am seeing that others have posted that this has happened to them as well. Has anyone rec'd a response from Mercedes on this very dangerous flaw? How do I reset the headrests now that they are popped open?

---

[33] *See* mbworld.org/forums.

- 5/25/17 – My headrest has popped out twice that I reset myself, then it popped a third time. I brought it to the dealer they reset it and said all parts to it tested good [sic] and when they drove it, it did not pop. Less than 1 hour of picking up the car it popped, this time it serious [sic] hurt me and chipped two teeth from the impact to the back of my head….

- 4/15/19 – Hi, 30 seconds after starting my C300 4 Matic 2009 after day work [sic], rolling about 5 mph, my headrest deployed with a big noise but I did not have any accident! I then parked and checked all around the car and there was no mark at all. The red warning light—airbags—is on and the message center tell me [sic] 2 messages: there is a problem with the left side contact your dealer, and the same for the right side (even though the right headrest is ok).

### Technical Service Bulletins

139.   In 2008, the Mercedes Defendants were aware that the defective AHRs were deploying in Class Vehicles when there had not been an accident and endeavored to conceal the true nature of the defect.  The Mercedes Defendants issued at least one Technical Service Bulletin (TSB) acknowledging the issue of uncommanded deployments but misrepresenting the nature of the defect.

140.   On or around, October 9, 2008, the Mercedes Defendants issued a TSB titled "Restraints – Head Restraint Activate Without Cause" to its exclusive network of Dealerships. Despite their prior, exclusive, and superior knowledge that the reason for the uncommanded deployments was the inferior plastic design, TSB No. T-B-91 16/177 falsely indicates that the problem "may be caused by damage to the seat

wiring harness causing a short circuit."

141.    Upon information and belief, the Mercedes Defendants issued this TSB in an attempt to conceal that the NECK-PRO headrests contained an inherent design defect and to avoid the cost of replacing the NECK-PRO's with non-defective headrests.

### **Mercedes Fails to Divulge the Defect**

142.    Mercedes and Grammer had exclusive and superior knowledge, prior to installing the defective NECK-PRO, that the design was defective and the AHR is likely to malfunction.  Similarly, given the location of the AHR and its intended purpose, Mercedes knew or should have known that such a malfunction could cause injury to drivers and passengers, and that an uncommanded deployment might cause a driver to lose control of his or her vehicle while driving, thus endangering not only the occupants of the vehicle, but other people on the road.

143.    Despite being aware of the AHR defect, and accompanying safety risk, both Mercedes and Grammer have failed to notify owners of Class Vehicles of the defect, not recalled affected Class Vehicles to replace the defective AHR, and made no attempt to compensate Class Vehicle owners for the diminution in vehicle value.

144.    In fact, Mercedes has taken affirmative steps to conceal this defect by, among other things, notifying NHTSA and dealers that the issue is a "short circuit"

in the wiring.

145.   Grammer intentionally has taken no action to reveal the defect in its AHR, and instead concealed and failed to disclose the safety issue caused by the defective AHR components.

146.   Likewise, Mercedes intentionally misrepresents the safety features of its headrests and conceals the defect from consumers in its owner's manuals, affirmative statements about the safety of its vehicles, and advertising.

147.   Plaintiff Harris's experience with the defective AHR in her Mercedes is indicative of the Mercedes Defendants' common practice of concealing the defect when a consumer has an uncommanded deployment. In November 2019, while driving on the highway, without any external force, the driver-side headrest in Ms. Harris's vehicle deployed and struck her in the back of the head.

148.   When Plaintiff Harris took her car to the dealership for repair, her MBUSA dealership told her that her car had been involved in an accident, even though Plaintiff Harris knew that it had not. Eventually, the dealership admitted that the deployment had not been caused by an accident.

149.   The MBUSA dealership did not disclose to Plaintiff Harris that the uncommanded deployment was due to the inexpensive and inferior plastic used in the design of the AHR.  In fact, in keeping with the pattern of concealment of the

defect, the dealership would not even allow Ms. Harris to retrieve the deployed headrest and allow her to inspect it on her own.

150.   The Mercedes Defendants continue to fail to cover the cost to repair or replace headrests that have spontaneously deployed, recall the Class Vehicles, or warn vehicle owners and the general public about the defect and corresponding safety risk of driving or riding in a Mercedes vehicle installed with the defective NECK-PRO.

## **Plaintiffs Have Been Damaged**

151.   As a result of Mercedes' conduct in manufacturing, installing, and selling Class Vehicles containing the defective AHRs, and further in failing to disclose and actively and fraudulently concealing the defect, Plaintiffs and proposed Class members were harmed and suffered actual damages.  The defective NECK-PRO installed in the headrests diminish the value of the Class Vehicles.

152.   Plaintiffs and the proposed Class members were deprived of the benefits of their bargains.  The Mercedes vehicles they purchased or leased were of a lesser standard, grade, and quality than Mercedes represented, and they did not receive vehicles that met ordinary and reasonable consumer standards for safe and reliable operation.  Plaintiffs and Class members paid more for their vehicles than they would have had Defendants disclosed the defective AHR, whether in monthly

lease payments or through a higher purchase price.

153.   Mercedes has unjustly benefitted from putting a defective product on the market, and Plaintiffs and Class members were deprived of safe, defect-free components in their Class Vehicles.

154.   Plaintiffs and Class members have also suffered out-of-pocket damages, including but not limited to loss-of-use expenses, paying for rental cars or other transportation arrangements, paying for diagnostic testing at repair facilities, and paying to replace headrests damaged by the spontaneous deployment of the AHR that the Mercedes Defendants would not cover.

155.   Plaintiffs bring this action on behalf of themselves and the putative Class members to recover damages for their lost benefit of the bargain; out-of-pocket expenses, including repair costs due to the defective AHR; and to obtain an injunction requiring the Mercedes Defendants to repair and/or replace the defective AHRs and prevent risk of future harms.

**<u>MBUSA Breaches Implied Warranties</u>**

156.   MBUSA sells and leases Class Vehicles with implied warranties that assure buyers the vehicles are free from defects. The NECK-PRO defect violates the warranties.

157.   Under the Uniform Commercial Code, a warranty that goods are

merchantable is implied in all contracts for sale, so long as the seller is a merchant with respect to goods of that kind.  U.C.C. § 2-314 (1).  To be "merchantable," goods must be fit for the ordinary purposes for which they are used and must conform to the promise or affirmations of fact made on labels.

158.   The defective AHR renders Class Vehicles unfit and unsafe for ordinary use at the time of the Class Vehicles' initial sale.  Further, the AHR fails to conform to the promises of safety and appropriate deployment as described in Mercedes owners' manuals.

159.   The AHR has an inferior, low-grade plastic component despite the availability of several commercially viable superior alternatives.  For example, fiber-reinforced plastics, which contain either glass fibers or carbon fibers, are readily available to manufacturers and can be used in injection-mold applications like the AHR.  In fiber-reinforced plastics, the strength comes from the glass fiber or carbon fiber, while the plastic holds the fibers together and gives the object its shape.  These plastics are better suited to withstand the constant force being applied by the two springs.  Indeed, other components of the AHR that are not subjected to the constant force of the springs are designed with fiber-reinforced plastic.

160.   Because the NECK-PRO headrest is designed and manufactured with cheap, inferior, low-grade plastic material, MBUSA has breached its implied

warranties of merchantability.

## IV.   TOLLING OF THE STATUTE OF LIMITATIONS

### Discovery Rule Tolling

161.   Within the time period of any applicable statutes of limitation, Plaintiffs and Class members could not have discovered, through the exercise of reasonable due diligence, that Defendants were concealing the defect in the headrests and misrepresenting the safety and reliability of the AHR contained in the headrests installed in Class Vehicles.

162.   Mercedes has refused to issue a recall and Class Members have no way of knowing about the defect until the AHR in their vehicle spontaneously deploys. Even after a spontaneous deployment, Plaintiffs and Class members had no ability to discover the actual nature of the defect—the use of the cheap plastic that is unable to withstand the constant force of the springs—because Defendants' active concealment, and prior knowledge, of the defect.

163.   For these reasons, all applicable statutes of limitations have been tolled by operation of the delayed discovery rule.

### Fraudulent Concealment Tolling

164.   All applicable statutes of limitation have also been tolled by Defendants' knowing and active fraudulent concealment and denial of the defect in

the AHR throughout the time period relevant to this action.

165.   Mercedes is under a continuing duty to disclose the true character, quality, and nature of the Class Vehicles to the Plaintiffs and the Class members. Neither Mercedes nor Grammer disclosed information about the defective AHR, and instead, as discussed above, knowingly, affirmatively, or actively concealed such character.

166.   Mercedes also actively concealed the defect by representing to consumers who presented their vehicles for repair that the uncommanded deployments could be remedied by replacing the AHRs at the vehicle owner's or lessee's expense. In fact, the uncommanded deployments could not be repaired or remedied, as they were the product of a uniform, common, and latent defect in the NECK-PRO AHRs and Mercedes would simply replace the broken NECK-PRO with a replacement containing the same latent defect.

167.   Plaintiffs and Class Members reasonably relied upon Defendants' knowing, affirmative, or active concealment when they decided to purchase or lease Class Vehicles.

168.   Because Defendants actively concealed, and continue to actively conceal, the defect in the Class Vehicles, they are estopped from relying on any statutes of limitations defense.

61

**Estoppel**

169.   Mercedes and Grammer were, and are, under a continuous duty to disclose to Plaintiffs and Class members the true character, quality, and nature of the AHR in the Class Vehicles. Instead, they actively concealed the true character, quality, and nature of the AHR and knowingly made misrepresentations about the quality, reliability, safety characteristics, and performance of the AHR.

170.   Plaintiffs and Class members reasonably relied upon Defendants' knowing and affirmative misrepresentations and active concealment of material facts. Therefore, Defendants are estopped from relying on any defense based on statutes of limitations in this action.

## VI.   CLASS ALLEGATIONS

**Class Definitions**

171.   Plaintiffs bring this class action on their own behalf, and on behalf of all persons similarly situated, pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure. This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions. Plaintiffs seek to certify the following proposed nationwide class and state subclasses:

*The Nationwide Consumer Class*

> All persons in the United States, except in Florida, who currently own or lease, or who have owned or leased, one or more Class Vehicles manufactured by Mercedes, or any of its subsidiaries or affiliates, which are equipped with headrests containing the defective AHR.

### The New York Consumer Subclass

Plaintiff Monopoli alleges statewide class action claims on behalf of:

> All persons in New York who currently own or lease, or who have owned or leased, one or more Class Vehicles manufactured by Mercedes, or any of its subsidiaries or affiliates, that are installed with headrests containing the defective AHR.

### The California Consumer Subclass

Plaintiffs Praglin and Harris allege statewide class action claims on behalf of:

> All persons in California who currently own or lease, or who have owned or leased, one or more Class Vehicles manufactured by Mercedes, or any of its subsidiaries or affiliates, that are installed with headrests containing the defective AHR.

### The North Carolina Consumer Subclass

Plaintiff Fitzpatrick alleges statewide class action claims on behalf of:

> All persons in North Carolina who currently own or lease, or who have owned or leased, one or more vehicles manufactured by Mercedes, or any of its subsidiaries or affiliates, that are installed with headrests containing the defective AHR.

172.  Excluded from each class are Defendants, their employees, officers,

directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliated companies; Class Counsel and their employees; business entities for purposes of claims for relief under the California Consumers Legal Remedies Act, Civil Code section 1750, *et seq*.; and the judicial officers and their immediate family members and associated court staff assigned to this case. Also excluded are claims for any personal physical injuries related to the AHR defect.

173.   Plaintiffs reserve the right to modify, expand, or amend the definitions of the proposed classes following the discovery period and before the Court determines whether class certification is appropriate.

174.   Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

**Numerosity**

175.   This action satisfies the requirements of Fed. R. Civ. P. 23(a)(1).  There are hundreds of thousands of Class Vehicles nationwide equipped with headrests that have the defective NECK-PRO, including thousands in Georgia.  Individual joinder of all Class members is impracticable.

176.   The identity of Class members is ascertainable, as the names and

addresses of all Class members can be identified in Mercedes' or their agents and dealerships' books and records, as well as state vehicle registrations and sales records.  Plaintiffs anticipate providing appropriate notice to each certified class in compliance with Fed. R. Civ. P. 23(c)(2)(A) and/or (B), to be approved by the Court after class certification, or pursuant to court order under Fed. R. Civ. P. 23(d).

**<u>Commonality</u>**

177.   This action satisfies the requirements of Fed. R. Civ. P. 23(a)(2) because there are questions of law and fact that are common to each of the classes. These common questions predominate over any questions affecting only individual Class members.  The predominating common or Class-wide fact questions include, without limitation:

a.   Whether the inferior plastic used in the AHR could withstand the force of the springs under normal operating conditions;

b.   Whether Defendants knew that the inferior plastic could not withstand the force of the springs under normal operating conditions;

c.   Whether there were other commercially viable plastic options to use in the manufacture of the AHR;

d.   Whether Defendants knowingly failed to disclose and warn U.S. consumers of the defect in the AHR;

e.   Whether Defendants had a duty to disclose to U.S.

consumers material facts relating to the defect in the AHR and the safety risk it presents;

f.  Whether the headrest installed by Mercedes in the Class Vehicles is defective and a safety risk due to a defective AHR;

g.  Whether the owner's manuals provided by Mercedes to consumers who purchased Class Vehicles sufficiently warn owners about the safety risk associated with the AHR;

h.  Whether the Class Vehicles have suffered diminution of value as a result of containing headrests with the defective AHR;

i.  Whether Mercedes' marketing of Class Vehicles was likely to deceive or mislead consumers;

j.  Whether Defendants engaged in unfair, deceptive, unlawful and/or fraudulent acts or practices by failing to disclose that the headrests installed in Class Vehicles have defective AHR;

k.  Whether a reasonable consumer likely would be misled by Defendants' conduct;

l.  Whether Mercedes' conduct as alleged in this action, including the sale of the Class Vehicles installed with the defective NECK-PRO, constitutes a breach of applicable warranties;

m.  Whether Plaintiffs and the Class members suffered damages due to Mercedes' refusal to replace the headrests or repair Class Vehicles after the AHR deploys due to the defect; and

66

n.   Whether damages, restitution, equitable, injunctive, declaratory, or other relief is warranted.

**Typicality**

178.   This action satisfies the requirements of Fed. R. Civ. P. 23(a)(3) because Plaintiffs' claims are typical of the claims of each of the Class members, as all Class members were and are similarly affected and their claims arise from the same wrongful conduct by Mercedes.  Each Class member purchased or leased a Class Vehicle with a defective AHR installed in the headrests and thus as a result has sustained, and will continue to sustain, damages in the same manner as Plaintiffs. The relief Plaintiffs seek in this action is typical of the relief sought for the absent Class members.

**Adequacy of Representation**

179.   Plaintiffs will fairly and adequately protect the interests of the Class members.  Plaintiffs are committed to the vigorous prosecution of this action and there is no hostility or conflict between or among Plaintiffs and the unnamed Class members.  Plaintiffs anticipate no difficulty in the management of this litigation as a class action.

180.   To prosecute this case, Plaintiffs have chosen the undersigned law firms, who have substantial experience in the prosecution of large and complex class

action litigation and have the financial resources to meet the costs associated with the vigorous prosecution of this type of litigation. Plaintiffs and their counsel will fairly and adequately protect the interest of all Class members.

**Superiority/Predominance**

181.   This action satisfies the requirements of Fed. R. Civ. P. 23(b)(3). A class action is superior to other available methods for the fair and efficient adjudication of the rights of the Class members. The joinder of individual Class members is impracticable because of the vast number of Class members who own the affected Class Vehicles.

182.   Because the monetary damages suffered by each individual Class member may be relatively small, the expense and burden of individual litigation would make it difficult or impossible for individual Class members to redress the wrongs done to each of them individually, such that most or all Class Members would have no rational economic interest in individually controlling the prosecution of specific actions. The burden imposed on the judicial system by individual litigation, and to the Defendants, by even a small fraction of the Class members, would be enormous.

183.   In comparison to piecemeal litigation, class action litigation presents far fewer management difficulties, far better conserves the resources of both the

judiciary and the parties, and far more effectively protects the rights of each Class member.  The benefits to the legitimate interests of the parties, the court, and the public resulting from class action litigation substantially outweigh the expenses, burdens, inconsistencies, economic infeasibility, and inefficiencies of individualized litigation. Class adjudication is simply superior to other alternatives under Fed. R. Civ. P. 23(b)(3)(D).

184.   Plaintiffs are unaware of any obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action. Rule 23 provides the Court with the authority and flexibility to maximize the efficiencies and benefits of the class mechanism and reduce management challenges. The Court may, on motion of Plaintiffs or on its own determination, certify nationwide and statewide classes for claims sharing common legal questions; utilize the provisions of Fed. R. Civ. P. 23(c)(4) to certify particular claims, issues, or common questions of law or of fact for class-wide adjudication; certify and adjudicate bellwether class claims; and utilize Fed. R. Civ. P. 23(c)(5) to divide any Class into subclasses.

### Requirements of Fed. R. Civ. P. 23(b)(2)

185.   Mercedes has acted or failed to act in a manner generally applicable to the Class members in the Nationwide Class and the New York, California, and North

Carolina subclasses, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to either or all the classes.

## V.   CLAIMS FOR RELIEF

### COUNT I
### FRAUDULENT CONCEALMENT
### by all Plaintiffs against Defendants MBUSA and Daimler on behalf of all Class Members

186.   Plaintiffs re-allege and incorporate by reference paragraphs 1-172 as if fully set forth herein and further allege as follows.

187.   Mercedes concealed and suppressed material facts concerning the defective AHRs installed in the headrests, namely that they are, in fact, defective and prone to cracking, breaking, and deploying without warning; the defect causes the AHR to deploy without the vehicle being involved in a rear-end collision; and the defect poses a threat of serious injury to occupants. Mercedes knew that these representations and omissions were false when made.

188.   Mercedes had a duty to disclose the defect because it is a safety-related defect which gives rise to an unreasonable risk and, correspondingly, a duty to disclose.

189.   Additionally, as an automobile manufacturer, Mercedes also has a duty to report all safety-related defects to the NHTSA. NHTSA defines safety-related

defects to include "[s]eats and/or seat backs that fail unexpectedly during normal use."[34]

190.   Mercedes also had a duty to disclose the defect because Mercedes possessed exclusive and superior knowledge of material facts regarding the defective AHRs which were not reasonably discoverable to Plaintiffs or the Class.  Mercedes opted to use unsuitable and inferior ABS plastic for the plastic bracket in its NECK-PRO head restraints, knowing that such plastic could not withstand the pressure that would be exerted upon it during the ordinary operation of Mercedes vehicles. Mercedes also received early consumer reports about the defect, including reports to Mercedes dealerships as early as March 3, 2013, and likely earlier, and reviewed engineering design reports, pre-production testing, pre-production design failure mode analyses, manufacturing and design validation reports, plastic aging tests, ABS plastic material data reports, aggregate warranty data from Mercedes dealerships, and repair order and parts data from dealerships, among other things.

191.   Mercedes had a duty to disclose the defect because it took steps to actively conceal the defect from consumers, not only by failing to report the defect to NHTSA as required by federal law, but also by misrepresenting to NHTSA that

---

34  Motor Vehicles and Safety Defects:  What Every Owner Should Know, available at https://www-odi.nhtsa.dot.gov/recalls/recallprocess.cfm.

the defect resulted from "damage to the seat wiring harness causing a short circuit." Mercedes made this misrepresentation knowing that the defect arose from NECK-PRO's defective design, and specifically from the use of inferior ABS plastic, and not from damage to the seat wiring harness.  These omitted and concealed facts were material because they directly impact the safety of the Class Vehicles as well as the price Plaintiffs and Class members would have been willing to pay for their Class Vehicles.

192.   Mercedes also had a duty to disclose the defect because it undertook to represent to consumers that that the Class Vehicles were reliable and safe; identify the AHR as a safety feature; and proclaim that Mercedes maintained the highest safety standards.

193.   Finally, Mercedes had a duty of reasonable care and competence to Plaintiffs and the Class members, who rely upon Mercedes' representations and omissions regarding the safety of their vehicles. Mercedes was manifestly aware of the use to which its misrepresentations and omissions would be put and intended that they be so used.

194.   Mercedes actively concealed or suppressed these material facts, in whole or in part, to induce Plaintiffs and Class members to purchase or lease the Class Vehicles at high prices, and to protect its profits and avoid a costly recall, and

Mercedes did so at the expense of the safety of Plaintiffs and the Class members.

195.  Plaintiffs and the class members could not have discovered the AHR defect in the exercise of due diligence. Mercedes and Grammer had exclusive knowledge that uncommanded deployments were the result of a latent design defect, and both actively concealed from and failed to disclose to consumers the existence and nature of the defect.

196.  Plaintiffs and the Class members were unaware of these omitted material facts and relied on Mercedes' omissions and misrepresentations; had they known their Mercedes vehicles included a safety defect, they would have paid less, or would not have purchased the vehicles.  Plaintiffs' and the Class members' actions were reasonable and justified.

197.  On information and belief, Mercedes has still not made any disclosure regarding the defective AHR, despite having knowledge through agents at Mercedes dealerships and Mercedes service centers that the defect is evident in vehicles.

198.  Because of the concealment or suppression of the facts, Plaintiffs and the Class members sustained damages because they did not receive the benefit of their bargain and the value of the Class Vehicles has been diminished, which is a direct result of Mercedes' wrongful conduct.

199.  Mercedes' acts were done oppressively, deliberately, with intent to

defraud, and in reckless disregard of Plaintiffs' and the Class members' rights and well-being to enrich itself. Mercedes' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future.

**COUNT II**
**FRAUDULENT MISREPRESENTATION**
**by all Plaintiffs against Defendants MBUSA and Daimler on behalf of all Class Members**

200.   Plaintiffs re-allege and incorporate by reference paragraphs 1-172 as if fully set forth herein and further allege as follows.

201.   Mercedes has known since at least 2006 that the NECK-PRO AHR was defective in its design and manufacture, and that uncommanded deployments would occur spontaneously and without rear impact. Having been involved in the design of the NECK-PRO AHR, Mercedes first learned of the defect through, among other things, engineering design reports, pre-production testing, pre-production design failure mode analyses, manufacturing and design validation reports, plastic aging tests, and plastic and material data reports. Its knowledge was affirmed over time through consumer complaints to NHTSA, consumer complaints to MBUSA dealerships, consumer complaints on website forums, aggregate warranty data compiled from MBUSA dealerships, and repair orders and parts data received from dealerships.

202.   Despite this knowledge, Mercedes and its agents marketed the NECK-PRO AHR as safety equipment, and represented to Plaintiffs and the Class that its vehicles equipped with the NECK-PRO AHR were safe, and that the NECK-PRO enhanced, rather than detracted from, the vehicles' overall safety. Examples of Mercedes' representations to consumers are set forth in paragraphs 103-114 of this complaint.

203.   Mercedes and its agents also omitted material facts about the AHR defect from its communications with consumers. Neither Mercedes nor its agents disclosed the defect or the risks it posed to Plaintiffs or the Class when they purchased their vehicles, nor did Mercedes or its agents explain to consumers like Plaintiff Harris that the uncommanded deployments they had experienced resulted from a common and latent design and manufacturing defect. Finally, Mercedes made no public disclosure of the defect, nor did it issue any recall.

204.   Mercedes made these misrepresentations and omissions in the inducement of its sale of Mercedes vehicles to Plaintiffs and the class, knowing that its representations and omissions were false and misleading. Mercedes intended to deceive Plaintiffs and the Class with its misrepresentations and omissions. Mercedes withheld material facts about the NECK-PRO safety defect from consumers so that it could continue to profit from the sale of vehicles equipped with

the NECK-PRO AHR and avoid an expensive nationwide recall.

205.   Mercedes had a duty of reasonable care and competence to Plaintiffs and the Class members, who rely upon Mercedes' representations and omissions regarding the safety of their vehicles. Mercedes was manifestly aware of the use to which its misrepresentations and omissions would be put and intended that they be so used.

206.   Plaintiffs and the Class members relied on Mercedes' material misrepresentations and omissions. Plaintiffs and the Class members would not have purchased Mercedes vehicles equipped with the NECK-PRO AHR had they known that the AHRs carried a dangerous design and manufacturing defect that would cause their headrests to deploy spontaneously, putting their safety, and their families' safety, at risk while driving. Plaintiffs' and the Class members' reliance was reasonable and justified.

207.   Due to Mercedes' fraudulent misrepresentations and omissions, Plaintiffs and the Class members sustained damages because they did not receive the benefit of their bargains and the value of the Class Vehicles has been diminished, which is a direct result of Mercedes' wrongful conduct.

208.   Mercedes' acts were done oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class members' rights and

well-being to enrich itself. Mercedes' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future.

## COUNT III
### NEGLIGENCE – NEGLIGENT DESIGN & MANUFACTURE
### by all Plaintiffs against Daimler on behalf of all Class Members

209.   Plaintiffs re-allege and incorporate by reference paragraphs 1-172 as if fully set forth herein and further allege as follows.

210.   Daimler and Grammer designed the NECK-PRO AHR System for sale to consumers such as Plaintiffs, and Daimler manufactured Class Vehicles incorporating the defective AHR at all times relevant to Plaintiffs' claims.

211.   Daimler had a duty to exercise ordinary care in both the design of the NECK-PRO AHR and the manufacture of the Class Vehicles. Daimler elected to use ABS, lightweight, thermoplastic polymer with relatively cheap production costs in the design and manufacture of the NECK-PRO, and knew or should have known that a bracket made of ABS could not withstand the considerable and constant pressure that would be exerted on it through the normal operation of Mercedes' vehicles.

212.   Daimler knew or should have known that the ABS bracket used in the NECK-PRO is prone to cracking and breaking, and would cause the NECK-PRO AHR to deploy spontaneously even in the absence of a rear-end collision.  Despite

this knowledge, Daimler manufactured class vehicles incorporating the defective AHRs. In so doing, Daimler breached its duty of care to foreseeable consumers including Plaintiffs and the Class.

213.   Daimler's negligent design of the NECK-PRO AHR and negligent manufacture of the Class Vehicles led to a defect in the product that existed when the Class Vehicles left the manufacturer. As a result, Plaintiffs and the Class purchased Class Vehicles that carried a latent defect at the point of sale.

214.   As a direct, legal, and proximate result of Daimler's negligent design and manufacture, Plaintiffs and the Class suffered economic losses in the form of the lost benefit of their bargains with Mercedes and its agents.

215.   Daimler's negligent design of and manufacture the Class Vehicles, including the negligent design of its AHR systems, was a substantial factor in causing Plaintiffs' injuries as set forth above.

**COUNT IV**
**NEGLIGENCE – FAILURE TO WARN**
**by all Plaintiffs against Defendants MBUSA and Daimler on behalf of all**
**Class Members**

216.   Plaintiffs re-allege and incorporate by reference paragraphs 1-172 as if fully set forth herein and further allege as follows.

217.   At all times relevant hereto, Mercedes designed, distributed, sold,

marketed, and promoted the NECK-PRO AHR System for sale to consumers such as Plaintiffs.

218.   Daimler elected to use ABS, lightweight, thermoplastic polymer with relatively cheap production costs in the design and manufacture of the NECK-PRO, and knew that a bracket made of ABS could not withstand the considerable and constant pressure that would be exerted on it through the normal operation of Mercedes' vehicles. Mercedes knew the ABS bracket used in the NECK-PRO is prone to cracking and breaking, and would cause the NECK-PRO AHR to deploy spontaneously even in the absence of a rear-end collision.

219.   Mercedes has known since at least 2006 that the NECK-PRO AHR was defective, and that uncommanded deployments would occur spontaneously and without rear impact. Having been involved in the design of the NECK-PRO AHR, Mercedes learned of the defect through, among other things, engineering design reports, pre-production testing, pre-production design failure mode analyses, manufacturing and design validation reports, plastic aging tests, and plastic and material data reports. Its knowledge was affirmed over time through consumer complaints to NHTSA, consumer complaints to MBUSA dealerships, consumer complaints on website forums, aggregate warranty data compiled from MBUSA dealerships, and repair orders and parts data received from dealerships.

220.   Because Mercedes knew the NECK-PRO AHR carried a latent and dangerous defect, it had a duty to warn Plaintiffs and the Class of the defect's existence.

221.   Mercedes had a duty of reasonable care and competence to Plaintiffs and the Class members, who rely upon Mercedes' representations and omissions regarding the safety of their vehicles. Mercedes was manifestly aware of the use to which its misrepresentations and omissions would be put and intended that they be so used.

222.   Mercedes breached its duties to Plaintiffs and the Class by failing to disclose the defect or to warn of the defect's latent dangers. Neither Mercedes nor its agents disclosed the defect or the foreseeable risks it posed to Plaintiffs or the Class when they purchased their vehicles or at any time thereafter. In fact, Mercedes never made any public or transactional disclosure of the defect, nor did it issue any recall.

223.   Plaintiffs and the Class suffered damages in the form of the lost benefit of their bargains as a direct and proximate result of Mercedes' failure to warn. Plaintiffs would not have purchased their vehicles, or would have paid less, had Mercedes warned them of the dangers associated with the defect.

224.   Mercedes' failure to warn Plaintiffs and the Class about the NECK-

PRO AHR defect, and the dangers associated with the effect, was a substantial factor in causing Plaintiffs' injuries as set forth above.

**COUNT V**
**VIOLATION OF NEW YORK GENERAL BUSINESS LAW**
**N.Y. Gen. Bus. Law. § 349**
**against Defendants MBUSA and Daimler**
**on behalf of Plaintiff Monopoli and the New York Subclass**

225.   Plaintiff Monopoli re-alleges and incorporates by reference paragraphs 1-172 as though fully set forth herein.

226.   Monopoli and the New York subclass members are "persons" within the meaning of New York General Business Law § 349(h).

227.   The Mercedes Defendants are a "person," "firm," "corporation," or "association" within the meaning of New York General Business Law § 349(b).

228.   The New York General Business Law makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade, or commerce." N.Y. Gen. Bus. Law. § 349. Mercedes' conduct towards consumers, described above and below, constitutes "deceptive acts or practices" within the meaning of the N.Y. Gen. Bus. Law.

229.   Mercedes' actions set forth above and below took place in the conduct of trade or commerce.

230.   Mercedes failed to disclose, and actively concealed, the safety issue

posed by the defective AHR in the headrests installed in the Class Vehicles, and otherwise acted with a tendency or capacity to deceive consumers of its vehicles.

231.   Mercedes engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of material facts regarding the safety defect in the AHR with the intent that others would rely on such misrepresentations, concealment, suppression, or omissions in connection with the purchase of Class Vehicles.

232.   Mercedes intentionally and knowingly misrepresented or omitted material facts regarding the defective AHR in the headrests installed in Class Vehicles with an intent to mislead Monopoli and the New York subclass members.

233.   Mercedes knew, or should have known, that its conduct violated the N.Y. Gen. Bus. Law.

234.   Mercedes made material written and oral statements about the safety of the Class Vehicles, as alleged above and below, that were either false or misleading.

235.   Mercedes owed Monopoli and the New York subclass members a duty to disclose the true safety and reliability of the Class Vehicles because Mercedes:

   a. Possessed exclusive and superior knowledge of the dangers and risks posed by the defective AHR;
   b. Intentionally concealed the defect and the dangers and risks posed by the defective AHR; or

   c. Made incomplete representations about the safety and reliability of the Class Vehicles generally, while knowingly, willfully, and purposefully withholding material facts about the defective AHR that contradicted those representations.

236. Monopoli and the New York subclass members were injured as a result of Mercedes' conduct because Monopoli and the New York subclass members now own or possess Class Vehicles for which they overpaid.

237. Mercedes' failure to disclose, and active concealment of, the dangers and safety risks posed by the defective AHR in Class Vehicles were material to Monopoli and the New York subclass members.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

238. Monopoli and the New York subclass members suffered ascertainable losses as a result of Mercedes' misrepresentations, and failure to disclose information, about the defective AHR.  Had they been aware of the defect that existed in the headrests installed in the Class Vehicles, Monopoli and the New York subclass members either would have paid less for their vehicles or would not have purchased or leased their vehicles.  Monopoli and the New York subclass members did not receive the benefit of their bargain due to Mercedes' misconduct.

239.   Monopoli and the New York subclass members risk irreparable injury as a result of Mercedes' conduct in violation of the N.Y. Gen. Bus. Law.  These violations present a continuing safety risk to Monopoli, to the New York subclass members, and to the general public.

240.   As a direct and proximate result of Mercedes' violations of the N.Y. Gen. Bus. Law, Monopoli and the New York subclass members have suffered injury-in-fact or actual damage.

241.   Monopoli and the New York subclass seek punitive damages against Mercedes because Mercedes' conduct was egregious in that Mercedes willfully and knowingly concealed and misrepresented a material fact relating to the safety of Class Vehicles and risk to Class Vehicle drivers, occupants, and the public.

242.   Monopoli, on behalf of the New York subclass members, seeks actual damages; discretionary treble damages; punitive damages; an order enjoining Mercedes' unfair or deceptive practices; an order requiring Mercedes to notify the New York subclass members of the defect,  and remedy the defect in the Class Vehicles; and awarding Monopoli and the New York subclass members' attorneys' fees; and any other just and proper relief available under N.Y. Gen. Bus. Law § 349.

**COUNT VI**
**VIOLATION OF NEW YORK GENERAL BUSINESS LAW**
**("N.Y. Bus. Law") N.Y. Gen. Bus. Law. § 350**

**against Defendants MBUSA and Daimler**
**on behalf of Plaintiff Monopoli and the New York Subclass**

243.   Plaintiff Monopoli re-alleges and incorporates by reference paragraphs 1-172 as though fully set forth herein.

244.   The Mercedes Defendants are engaged in the "conduct of business, trade, or commerce" within the meaning of New York General Business Law § 350.

245.   New York General Business Law § 350 makes unlawful "[f]alse advertising in the conduct of any business, trade, or commerce." False advertising includes "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in light of . . . representations [made] with respect to the commodity." N.Y. Gen. Bus. Law § 350-a.

246.   Mercedes made and disseminated in New York, or caused to be made and disseminated in New York, through advertising, marketing, and other publications, statements that were untrue or misleading, and that were known by Mercedes to be untrue, or that through the exercise of reasonable care should have been known to Mercedes to be untrue and misleading to consumers, including Monopoli and the New York subclass members.

247.   Mercedes violated New York General Business Law § 350 because the

misrepresentations and omissions regarding the safety of the Class Vehicles, and Mercedes' failure to disclose and active concealment of the dangers and risks posed by the defective AHR in headrests installed in Class Vehicles, as set forth above, were material and likely to deceive a reasonable consumer.

248.   Monopoli and the New York subclass members have suffered injury, including the loss of money or property, as a result of Mercedes' false advertising. In purchasing or leasing Class Vehicles with the defective AHR, Monopoli and the New York subclass members relied on Mercedes' misrepresentations and omissions with respect to safety and reliability of the Class Vehicles. Mercedes' representations were false and misleading because Mercedes concealed the existence of a defective AHR affecting the safety, reliability, and value of the Class Vehicles.  Had Monopoli and the New York subclass members known that the Class Vehicles were unsafe due to the defective AHR, they would not have purchased or leased the vehicles, or would have paid less for them.

249.   Pursuant to New York General Business Law § 350, Monopoli, on behalf of himself and the New York subclass members, seeks monetary relief against Mercedes measured as the greater of (a) actual damages in an amount to be determined at trial; or (b) statutory damages of $500 each. Because Mercedes' conduct was committed willfully and knowingly, Monopoli and the New York

subclass members are entitled to recover treble damages up to $10,000 each.

250.   Monopoli, on behalf of himself and the New York Subclass Members, seeks an order enjoining Mercedes' unlawful, unfair, and deceptive practices; attorneys' fees; and any other just and proper relief available under New York General Business Law § 350.

**COUNT VII**
**VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW**
**Cal. Bus. & Prof. Code §§ 17200, *et seq.***
**against Defendants Daimler and Mercedes-Benz USA, LLC**
**on behalf of Plaintiffs Praglin and Harris and the California Subclass**

251.   Plaintiffs Praglin and Harris re-allege and incorporate by reference paragraphs 1-172 as though fully set forth herein.

252.   Cal. Bus. & Prof. Code § 17200 makes unlawful "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising."

253.   Through engineering design reports, pre-production testing, pre-production design failure mode analyses, manufacturing and design validation reports, plastic aging tests, ABS plastic material data reports, consumer complaints to NHTSA, consumer complaints to MBUSA dealerships and on website forums, aggregate warranty data compiled from MBUSA dealerships, repair order and parts data received from dealerships, amongst other things Mercedes possessed exclusive

and superior knowledge and information that the Class Vehicles contained a dangerous defect and were likely to be dangerous when used in a reasonably foreseeable manner. Mercedes continued to advertise, market, and sell vehicles with the defective AHR after becoming aware of the potential for danger, and failed to recall such vehicles and cure the defect.

254.   Mercedes concealed the existence and nature of the defective AHR, and the dangers and safety risks posed by the Class Vehicles and continued to represent that the Class Vehicles were safe and reliable when, in fact, they are not.

255.   Mercedes' misrepresentations and omissions regarding the safety and reliability of the Class Vehicles were likely to deceive a reasonable consumer, and the information withheld through these misrepresentations and omissions would be material to a reasonable consumer.

256.   Mercedes committed a fraudulent business act or practice in violation of § 17200 when it concealed, misrepresented, or omitted material information about the existence and nature of the defective AHR, and the dangers and risks posed by the Class Vehicles, while representing in long-term marketing and advertising campaigns, as well as other publications that the Class Vehicles were safe and reliable. Mercedes' active misrepresentation and concealment of the dangers and risks posed by the defective AHR in its vehicles are likely to mislead the public.

257.   Mercedes acted unfairly within the meaning of § 17200 because the acts and practices described above and below, including the manufacture, marketing, advertising, and sale of the Class Vehicles; and the failure to adequately investigate, disclose, and remedy the defective NECK-PRO, offend normal public policy. The harm Mercedes causes to consumers greatly outweighs any benefits associated with those practices. Mercedes' conduct also impaired and impairs competition in the automotive market and has prevented consumers, including Praglin and Harris and the California subclass members, from making fully informed decisions about whether to purchase or lease a Class Vehicle, and how much to pay for that vehicle.

258.   Plaintiffs Praglin and Harris and the California subclass members have suffered injuries, including the loss of money or property, as a result of Mercedes' unfair, unlawful, and deceptive practices.  Plaintiffs Praglin and Harris and the California subclass members were exposed to and relied on Mercedes' misrepresentations and omissions with respect to the safety and reliability of the Class Vehicles.  Had Praglin and Harris and the California subclass members known the truth, they would not have purchased or leased their vehicles, or would have paid less for them.

259.   The wrongful conduct alleged herein occurred and continues to occur in the conduct of Mercedes' business.  Mercedes' wrongful conduct is part of a

pattern or generalized course of conduct that is perpetuated and repeated to date.

260.   As a proximate and direct result of Mercedes' unfair and deceptive practices in violation of § 17200, Praglin and Harris and the California subclass members have suffered, and continue to suffer, actual damages.

261.   Plaintiffs Praglin and Harris, on behalf of themselves and the California subclass members, requests that this Court award them actual damages and enter any and all such orders or judgments as may be necessary to enjoin Mercedes from continuing its unfair, unlawful, and deceptive practices, as provided in Cal. Bus. & Prof. Code § 17203.

**COUNT VIII**
**VIOLATION OF CALIFORNIA CONSUMER LEGAL REMEDIES ACT**
**Cal. Civ. Code §§ 1750,** *et seq.*
**against Defendants MBUSA and Daimler**
**on Behalf of Plaintiffs Praglin, Harris, and the California Subclass**

262.   Plaintiffs Praglin and Harris re-allege and incorporate by reference paragraphs 1-172 as though fully set forth herein.

263.   The Class Vehicles are "goods" within the meaning of Cal. Civ. Code. § 1761(a).

264.   Plaintiffs Praglin and Harris, and the California subclass members, and Mercedes are "persons" within the meaning of Cal. Civ. Code § 1761(c).

265.  Praglin and Harris and the California subclass members are "consumers" within the meaning of Cal. Civ. Code § 1761(d).

266.  The California Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq*. ("CLRA"), prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer." Cal. Civ. Code § 1770(a).

267.  Mercedes engaged and engages in unfair or deceptive acts in violation of the CLRA as described above and below.  Mercedes represented and represents that the Class Vehicles and the AHR in the installed headrests have qualities, characteristics, benefits, and uses which they do not have; that they are of a particular standard, grade, and quality when they are not; advertised and advertises the Class Vehicles with the intent to sell or lease them in a quality or condition not as advertised; and represented and represents that the goods subject to transactions have been supplied in accordance with previous representations when, in fact, the goods are of a condition other than represented.

268.  As a pattern and in the normal conduct of business, Mercedes failed to disclose and actively concealed dangers and safety risks posed by a defective AHR in the headrests installed in the Class Vehicles, and otherwise acted with a tendency or capacity to deceive consumers.

269.   Mercedes acted unlawfully in its trade practices by representing that the Class Vehicles and the AHR in the headrests installed in the Class Vehicles have qualities that they do not, in fact, have; that they are of a particular standard when they are not; and by omitting material facts in describing them.

270.   Mercedes intentionally and knowingly misrepresented and omitted material facts regarding the Class Vehicles with an intent to mislead Praglin, Harris, and the California subclass members.  As alleged above and below, Mercedes made material statements and representations in long-term marketing and advertising campaigns, and in other publications, about the safety and reliability of the Class Vehicles that were either false or misleading.

271.   Mercedes owed Plaintiffs Praglin, Harris, and the California subclass members a duty to disclose the true safety and reliability of the Class Vehicles because Mercedes:

      a.   Possessed exclusive and superior knowledge about the dangers and safety risks posed by the defective AHR in the headrests installed in the Class Vehicles;

      b.   Intentionally concealed that information from consumers; and

      c.   Made incomplete or inaccurate representations about the safety and reliability of the Class Vehicles while purposefully withholding material information from consumers that contradicted those representations.

272.   Mercedes' incomplete, inaccurate, misleading, or false representations

and other unfair and deceptive acts were likely to deceive reasonable consumers including Praglin and Harris and the California subclass members.

273.   Mercedes knew or should have known that its conduct violated the CLRA.

274.   Mercedes acted unfairly within the meaning of the CLRA because the acts and practices described herein, including the manufacture, marketing, advertising, and sale of the Class Vehicles and the failure to adequately investigate, disclose, and remedy the defective AHR offend normal public policy.  The harm Mercedes causes to consumers greatly outweighs any benefits associated with those practices.  Mercedes' conduct also impaired and impairs competition in the automotive market and has prevented consumers, including Praglin and Harris and the California subclass members, from making fully informed decisions about whether to purchase or lease a Class Vehicle, and how much to pay for that vehicle.

275.   Praglin, Harris, and the California subclass members have suffered injuries, including the loss of money or property, as a result of Mercedes' unfair, unlawful, and deceptive practices.  Praglin, Harris, and the California subclass members were exposed to and relied on Mercedes' misrepresentations and omissions with respect to the safety and reliability of the Class Vehicles.  Had Praglin, Harris, and the California subclass members known the truth, they would not have

purchased or leased their vehicles, or would have paid less for them.

276.   The wrongful conduct alleged herein occurred and continues to occur in the conduct of Mercedes' business.   Mercedes' wrongful conduct is part of a pattern or generalized course of conduct that is perpetuated and repeated to date.

277.   As a proximate and direct result of Mercedes' unfair and deceptive practices in violation of the CLRA, Praglin, Harris, and the California subclass members have suffered, and continue to suffer, actual damages.  Praglin, Harris, and the California subclass members currently own or lease Class Vehicles inherently unsafe to operate in a normal and expected fashion due to the defective AHR in the headrests.

278.   Plaintiffs Praglin and Harris provided notice of their CLRA claims to Mercedes' counsel on February 27, 2021, and to Mercedes on March 2, 2021. Copies of the letters are attached as **Exhibit A**. Mercedes has taken no action to cure the defect described in the letters or remedy Plaintiffs' losses.

279.   Praglin and Harris, on behalf of themselves and the California subclass members, request that this Court award them and the California Subclass actual and punitive damages, and enter judgment against Mercedes under the CLRA for an injunction requiring Mercedes to notify the California subclass members of the defect and adequately inspect, repair, and/or replace the headrests in the Class

Vehicles, and for an award of attorneys' fees pursuant to Cal. Civ. Code § 1780(d).

### COUNT IX
### VIOLATION OF CALIFORNIA FALSE ADVERTISING LAW
### Cal. Bus. & Prof. Code §§ 17500, *et seq.*
### against Defendants MBUSA and Daimler
### on Behalf of Plaintiffs Praglin and Harris and the California Subclass

280.   Plaintiffs Praglin and Harris re-allege and incorporate by reference paragraphs 1-172 as though fully set forth herein.

281.   California Bus. & Prof. Code. § 17500 makes it unlawful "for any . . . corporation . . . with intent directly or indirectly to dispose of real or personal property . . . to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated . . . from this state before the public in any state, in any newspaper or other publication, or any advertising device . . . or in any other manner or means whatever, including over the Internet, any statement . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

282.   Mercedes made and disseminated, or caused to be made or disseminated, through California and the various states, statements in long-term advertising and marketing campaigns, as well as statements in third-party publications, which were untrue or misleading and which were known, or reasonably should have been known to Mercedes, based on engineering design reports, pre-

production testing, pre-production design failure mode analyses, manufacturing and design validation reports, plastic aging tests, ABS plastic material data reports, consumer complaints to NHTSA, consumer complaints to MB dealerships and on website forums, aggregate warranty data compiled from MB dealerships, repair order and parts data received from dealerships, amongst other things, to be untrue and misleading to consumers including Praglin, Harris, and the California subclass members.

283.   Mercedes violated and violates § 17500 because it made and makes misrepresentations and omissions regarding the functionality, safety, and reliability of the Class Vehicles, as set forth above and below. These misrepresentations and omissions are and were material and likely to deceive a reasonable consumer, including Praglin, Harris, and the California subclass members.

284.   Praglin, Harris, and the California subclass members have suffered injuries-in-fact, including the loss of money or property, as a result of Mercedes' unfair, unlawful, and deceptive practices. Praglin, Harris, and California subclass members were exposed to and relied on Mercedes' misrepresentations and omissions with respect to the safety and reliability of the Class Vehicles.  Had Praglin, Harris, and the California subclass members known the truth about the defective AHR, they would not have purchased or leased their Class Vehicles, or otherwise would have

paid less for them. Accordingly, Plaintiffs Praglin, Harris, and the California subclass members were deprived of the benefit of their bargains.

285.    The wrongful conduct alleged above and below occurred, and continues to occur, in the conduct of Mercedes' business as part of a pattern or generalized course of conduct that is still perpetuated and repeated in the state of California and the various states.

286.    Plaintiffs Praglin and Harris, on behalf of themselves and the California subclass members, requests that this Court enter any such judgment necessary to enjoin Mercedes from continuing its unfair, unlawful, and deceptive practices and to restore to Praglin and Harris and the California subclass members any money that Mercedes acquired by unfair competition, including restitution and disgorgement in an amount to be determined at trial, and for any such other relief as is right and just.

**COUNT X**
**VIOLATION OF THE SONG-BEVERLY CONSUMER WARRANTY ACT**
**FOR BREACH OF THE IMPLIED WARRANTY OF**
**MERCHANTABILITY**
**Cal. Civ. Code §§ 1791.1 and 1792**
**against Defendants MBUSA and Daimler on behalf of**
**Plaintiffs Praglin, Harris, and the California Subclass**

287.    Plaintiffs Praglin and Harris re-allege and incorporate by reference paragraphs 1-172 as though fully set forth herein.

288.    In the event the Court declines to certify a Nationwide Class under the

Magnuson-Moss Warranty Act, this claim is brought only on behalf of the California subclass against the Mercedes Defendants.

289.   Plaintiffs Praglin, Harris, and the California subclass members are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

290.   The Class Vehicles, the headrests and the AHR are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

291.   Daimler is a "manufacturer" within the meaning of Cal. Civ. Code § 1791(j).

292.   MBUSA is a "retail seller," "seller," or "retailer" within the meaning of § Cal. Civ. Code 1791(l).

293.   Mercedes impliedly warranted to Praglin, Harris, and the California subclass members that the Class Vehicles were merchantable within the meaning of Cal. Civ. Code §§ 1791.1(a) and 1792. However, the Class Vehicles do not have the qualities of safety and reliability that a buyer would reasonably expect and were therefore not merchantable due to the defective AHR in the headrests.

294. Cal. Civ. Code § 1791(a) states that "implied warranty of merchantability" means that consumer goods meet the following criteria:

  a.  Pass without objection in the trade under the contract description;
  b.  Are fit for the ordinary purpose for which such goods are used;

98

     c.  Are adequately contained, packaged, and labeled; and

     d.  Conform to the promises or affirmations of fact made on the container or  label.

295.  The Class Vehicles and the headrests installed in them would not pass without objection in the automotive trade because the defective AHR deploys the headrest unexpectedly and at inappropriate times, posing a risk of serious injury to passengers and all other persons on the road.

296.  Because of the defective AHR, the Class Vehicles are not safe to drive, which is in fact the ordinary purpose for which vehicles are intended.

297.  The Class Vehicles and headrests with the defective AHR are not adequately labeled because the labeling fails to disclose the defect.

298.  Thus, Mercedes breached the implied warranty of merchantability because it manufactured and sold Class Vehicles in which the defective AHR deploys at random and risks serious injury to drivers, occupants, and others on the road.  In selling Class Vehicles without disclosing the existence or nature of the defective AHR, Mercedes deprived Plaintiffs Praglin, Harris, and the California subclass members the benefit of their bargain.

299.  Because the implied warranty for each Class Vehicle was breached at the time of their initial sale and remained breached during the subsequent resale of

any Class Vehicle, the defect manifested itself before the Song-Beverly implied warranty period expired.

300.    Mercedes had notice of the defect from customer complaints, from, among other things, repair requests at dealerships and service centers, from internal investigations, and from the defect of the same nature affecting the Grammer AHR head restraints in Fiat-Chrysler branded vehicles.

301.    Mercedes' breach of duty under the Song-Beverly Act directly and proximately caused Praglin, Harris, and the California subclass members to overpay for goods whose dangerous and defective condition substantially impairs their actual value.

302.    Under Cal. Civ. Code §§ 1791.1(d) & 1794, Plaintiffs Praglin and Harris and the California subclass members are entitled to damages and other legal and equitable relief including, at their election, the overpayment or the diminution in value of their vehicles.

303.    Pursuant to Cal. Civ. Code § 1794, Praglin, Harris, and the California subclass members are further entitled to costs and attorneys' fees.

**COUNT XI**
**VIOLATION OF NORTH CAROLINA UNFAIR AND DECEPTIVE**
**TRADE PRACTICES ACT**
**("N.C. UDTPA"), N.C. Gen. Stat. §§ 75-1.1 *et seq.***
**against Defendants MBUSA and Daimler**

**on behalf of Plaintiff Fitzpatrick and the North Carolina Subclass**

304.   Plaintiff Fitzpatrick re-alleges and incorporates by reference paragraphs 1-172 as though fully set forth herein.

305.   The Mercedes Defendants engage in "commerce" within the meaning of N.C. Gen. Stat. § 75-1.1(b).

306.   N.C. UDTPA broadly prohibits "unfair or deceptive acts or practices in or affecting commerce." N.C. Gen. Stat. § 75-1.1(a).

307.   Mercedes engaged in unfair and deceptive trade practices that violated N.C. UDTPA, including but not limited to the following:

    a.   Mercedes represented that the Class Vehicles have safety characteristics that they do not have;

    b.   Mercedes represented that the Class Vehicles are of a particular standard, quality, or grade, when they are not;

    c.   Mercedes knew of the defective AHR, but failed to disclose, and actively concealed, the existence of the defect to consumers or NHTSA.  Mercedes knew that such information was material to consumer transactions;

    d.   Mercedes intended for Fitzpatrick and the North Carolina subclass members to rely on their misrepresentations and omissions so that Fitzpatrick and the North Carolina subclass members would purchase or lease Class Vehicles.

308.   Mercedes' unfair or deceptive acts or practices, including concealing, omitting, or suppressing material facts about the defective AHR, had a tendency or

capacity to mislead; tended to create a false impression in consumers; were likely, to and did in fact, deceive reasonable consumers, including Fitzpatrick and the North Carolina subclass members, about the safety and reliability of Class Vehicles and the headrests installed in them, the quality of Mercedes brand, and the true value of the Class Vehicles.

309.   Mercedes intentionally and knowingly omitted and misrepresented material facts regarding the Class Vehicles and the headrests installed in them, with an intent to mislead Fitzpatrick and the North Carolina subclass members.

310.   Mercedes knew or should have known that its conduct violated the N.C. UDTPA.

311.   Fitzpatrick and the North Carolina subclass members were injured as a result of Mercedes' conduct because Fitzpatrick and the North Carolina subclass members now own or possess Class Vehicles for which they overpaid.

312.   Mercedes' failure to disclose, and active concealment of, the dangers and safety risks posed by the defective NECK-PRO in Class Vehicles were material to Fitzpatrick and the North Carolina subclass members.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

313.   Fitzpatrick and the North Carolina subclass members suffered ascertainable loss as a result of Mercedes' misrepresentations and failure to disclose information.  Had they been aware of the defect that existed in the Class Vehicles, Fitzpatrick and the North Carolina subclass members either would have paid less for their Class Vehicles or would not have purchased or leased their vehicles. Fitzpatrick and the North Carolina subclass members did not receive the benefit of their bargain due to Mercedes' misconduct.

314.   Fitzpatrick and the North Carolina subclass members risk irreparable injury as a result of Mercedes' conduct in violation of the N.C. UDTPA. These violations present a continuing safety risk to Fitzpatrick, the North Carolina subclass members, and the general public.

315.   As a direct and proximate result of Mercedes' violations of the N.C. UDTPA, Fitzpatrick and the North Carolina subclass members have suffered injuries-in-fact or actual damage.

316.   Fitzpatrick, on behalf of the North Carolina Subclass Members, seeks treble damages; an order enjoining Mercedes' unfair or deceptive practices; an order requiring Mercedes to notify the North Carolina subclass members of the defective AHR and remedy the defect in the Class Vehicles; attorneys' fees; and any other just and proper relief available under N.C. Gen. Stat. § 75-16.

## COUNT XII
## VIOLATION OF GEORGIA UNIFORM DECEPTIVE AND UNFAIR TRADE PRACTICES ACT
## ("Georgia UDUTPA"), O.C.G.A. § 10-1-370 *et seq.*
## Plaintiffs against Defendants MBUSA and Daimler on behalf of all Class Members

317.   Plaintiffs re-allege and incorporate by reference paragraphs 1-172 as though fully set forth herein.

318.   The Mercedes Defendants are "persons" engaged in deceptive trade practices within the meaning of Georgia's UDUTPA.  *See* O.C.G.A. § 10-1-371(5).

319.   Georigia's UDUTPA prohibits deceptive trade practices committed in the course of one's business, vocation, or occupation, including "represent[ing] that goods or services have . . . characteristics, . . . uses, [or] benefits . . . that they do not have"; "[r]epresent[ing] that goods or services are of a particular standard, quality, or grade . . . if they are of another"; and  "[e]ngag[ing] in any other conduct which similarly creates a likelihood of confusion or of misunderstanding." *See* O.C.G.A. § 10-1-372(a).

320.  Mercedes engaged in unfair and deceptive trade practices that violated Georgia's UDUTPA, including but not limited to the following:

a.   Mercedes represented that the Class Vehicles have safety characteristics that they do not have;

b.   Mercedes represented that the Class Vehicles are of a particular

standard, quality, or grade, when they are not;

c.   Mercedes knew of the inferior plastic used in the NECK-PRO and that it fails under normal use but failed to disclose the existence of this defect to consumers or NHTSA.  Mercedes knew that such information was material to consumer transactions and vehicle safety;

d.   Mercedes actively conceals and misrepresents the true nature of the NECK-PRO defect; and

e.   Mercedes intended for Plaintiffs and the class members to rely on their misrepresentations and omissions so that they would purchase or lease Class Vehicles.

321.   Mercedes' unfair or deceptive acts or practices, including concealing, omitting, or suppressing material facts about the defective NECK-PRO, had a tendency or capacity to mislead; tended to create a false impression in consumers; and were likely to, and did in fact, deceive reasonable consumers, including Plaintiffs and the class members, about the safety and reliability of Class Vehicles; the quality of the Mercedes brand; and the true value of the Class Vehicles.

322.   Mercedes intentionally and knowingly misrepresented or omitted material facts regarding the Class Vehicles and the defective AHR installed in the vehicle headrests with an intent to mislead Plaintiffs and the class members.

323.   Mercedes knew or should have known that its conduct violated Georgia's UDUTPA.

324.   Plaintiffs and the class members were and are injured as a result of

Mercedes' conduct because the Plaintiffs and class members paid to own or lease a Class Vehicle without a safety defect in the headrests and instead received and overpaid for a vehicle containing the defective AHR.

325.   Mercedes' failure to disclose, and active concealment of, the defective AHR system and the dangers and risks it posed were material to the Plaintiffs and the class members.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

326.   Among other things, Mercedes has represented to Plaintiff Harris and other Class members that the NECK-PRO AHRs can be replaced at the consumer's expense when in fact, Mercedes replaces the defective AHRs with another defective AHR.

327.   Plaintiffs and the class members have suffered and will continue to suffer irreparable harm if Mercedes continues to engage in such deceptive, unfair, and unreasonable practices.

328.   Plaintiffs, on behalf of the class members, request that the Court issue an order for injunctive and declaratory relief requiring Mercedes to notify the class members of the defect and repair or replace the defective AHRs with non-defective

106

headrests. Plaintiffs also request that the Court enjoin Mercedes from replacing Plaintiffs' and Class members' NECK-PRO AHRs with new, defective AHRs, and from charging Plaintiffs and Class members for the cost of repair or replacement. As Mercedes has willfully engaged in trade practices it knows to be deceptive, Plaintiffs also request that the Court award Plaintiffs and the Class members attorneys' fees, and any other just and proper relief available under Georgia's UDUTPA.

**COUNT XIII**
**VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT**
**("Magnuson-Moss"), 15 U.S.C. § 2301, *et seq.***
**<u>against Defendants MBUSA and Daimler</u>**
**<u>on behalf of Plaintiffs and the Nationwide Class</u>**

329. Plaintiffs re-allege and incorporate by reference paragraphs 1-172 as though fully set forth herein.

330. Magnuson-Moss provides a private right of action by purchasers of consumer products against manufacturers or retailers who, among other things, fail to comply with the terms of express or implied warranties. *See* 15 U.S.C. § 2310(d)(1) (Remedies in consumer disputes). As alleged above, Mercedes has failed to comply with the terms of its implied warranties.

331. This Court has jurisdiction to decide claims brought under 15 U.C.C. § 2301 by virtue of 28 U.S.C. § 1332 (a)–(d).

332. The Class Vehicles are "consumer products" as defined by Magnuson-

Moss. *See* 15 U.S.C. § 2301(1).

333.   Plaintiffs and the Class members are "consumers" as defined by Magnuson-Moss. *See* 15 U.S.C. § 2301(3).

334.   Mercedes is a "supplier" and "warrantor" as defined by Magnuson-Moss. *See* 15 U.S.C. § 2301(4)-(5).

335.   As a supplier and warrantor, Mercedes is obligated to afford Plaintiffs and the Class members, as consumers, all rights and remedies available under Magnuson-Moss, regardless of privity.

336.   Magnuson-Moss provides a cause of action for, among other things, any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty. *See* 15 U.S.C. § 2310(d)(1).

337.   Defendants breached their implied warranties of merchantability, which they cannot disclaim under Magnuson-Moss, *see* 15 U.S.C. § 2308(a)(1), by failing to provide merchantable goods. Plaintiffs and the Class members have suffered damages as a result of Mercedes' breaches of warranties as set forth above.

338.   Any efforts to limit the implied warranties in a manner that would exclude coverage of the Class Vehicles is unconscionable, and any such effort to disclaim or otherwise limit liability for the Class Vehicles is null and void.

339.   Any limitations on the warranties are procedurally unconscionable.

There was unequal bargaining power between Mercedes and the Plaintiffs and Class members.

340.   Mercedes knew that the Class Vehicles were defective and posed safety risks, and that the Class Vehicles would continue to pose safety risks after the warranties purportedly expired. Mercedes failed to disclose the defect to Plaintiffs and other Class members. Therefore, Mercedes' enforcement of any durational limitations on warranties is unlawful.

341.   Plaintiffs and Class members have had sufficient direct dealings with either Mercedes or its agents and dealerships to establish privity of contract.

342.   Nonetheless, privity is not required here because Plaintiffs and Class members are intended third-party beneficiaries of contracts between Mercedes and its agents and dealerships, and specifically, of the implied warranties.   The warranties are intended to protect end-consumers, not dealers.   Dealers have no rights under the warranty agreements provided with the Class Vehicles.   Further, privity is not required because the Class Vehicles are dangerous instrumentalities due to the defective AHR.

343.   Mercedes' breaches of warranty have deprived Plaintiffs and other Class members of the benefit of their bargain.   The amount in controversy of the Plaintiffs' individual claims meets or exceeds the sum or value of $25. In addition,

the amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

344.   Plaintiffs and the Class members have suffered, and are entitled to recover, damages as a result of Mercedes' breach of warranty and violations of Magnuson-Moss.

345.   Mercedes had an opportunity to disclose information concerning the Class Vehicles' inability to perform as warranted, and to cure its breach of warranty. As yet, Mercedes has failed to do so.

346.   As a direct and proximate result of Mercedes' conduct, Plaintiffs and other Class members have suffered damages and continue to suffer damages, including economic damages at the point of sale or lease that is, the difference between the value of the vehicle as promised and the value of the vehicle as delivered.

347.   Additionally, or in the alternative, Magnuson-Moss provides for "other legal and equitable" relief where there has been a breach of warranty or failure to abide by other obligations imposed by Magnuson-Moss. *See* 15 U.S.C. § 2310(d)(1). Rescission and Revocation of Acceptance are equitable remedies available to Plaintiffs and the Class members under Magnuson-Moss.

348.   Plaintiffs also seeks under Magnuson-Moss an award of costs and expenses, including attorneys' fees, to prevailing consumers in connection with the commencement and prosecution of this action. *See* 15 U.S.C. § 2310(d)(2). Plaintiffs and the Class members intend to seek such an award, including expert witness costs and other recoverable costs, as prevailing consumers at the conclusion of this lawsuit.

**COUNT XIV**
**UNJUST ENRICHMENT**[35]
**against Defendants MBUSA and Daimler**
**on behalf of Plaintiffs and Nationwide Class**

349.   Plaintiffs re-allege and incorporate by reference paragraphs 1-172 as though fully set forth herein.

350.   The Mercedes Defendants have received and retained a benefit from the Plaintiffs and Class members and inequity has resulted.

351. Plaintiffs and the Class members directly conferred benefits on Mercedes: the price paid for the Class Vehicles advertised as having the safety feature of the AHR which was defectively designed and does not function as advertised.

---

[35] Plaintiffs bring their unjust enrichment claims against the Mercedes Defendants in the alternative to their warranty claims.

352.   Plaintiffs and the Class members paid their purchase prices in reliance on Mercedes' representations that the Class Vehicles were safe, fit for ordinary use, and equipped with the AHR that would only deploy in the case of a rear-end collision rather than at random.  Plaintiffs and the Class members would not have purchased the Class Vehicles, or would have paid less, if not for these representations.

353.   Mercedes benefitted through its unjust conduct by selling Class Vehicles equipped with headrests with the defective AHR at a profit and for more than the Class Vehicles were worth. Further, Mercedes has benefitted through its unjust conduct in refusing to recall and repair the defect in Class Vehicles and thus saving that cost.

354.   It would be inequitable for Mercedes to retain these benefits. Mercedes will be unjustly enriched if it is allowed to retain the aforementioned benefits, and each Class member is entitled to recover the amount by which Mercedes was unjustly enriched at his or her expense.

355.   Plaintiffs do not have an adequate remedy at law.

356.   The amount of Mercedes' unjust enrichment should be disgorged, in an amount to be proven at trial.

357.   Plaintiffs, on behalf of themselves and all similarly situated Class members, seek an award against Mercedes in the amount by which it has been

unjustly enriched at Plaintiffs' and the Class members' expense, and such other relief as this Court deems just and proper.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and all other similarly situated Class members, request that the Court enter judgment against Defendants as follows:

(1)     Declare this action to be a proper class action maintainable under Rule 23(b)(2) and Rule 23(b)(3) of the Federal Rules of Civil Procedure and designate and appoint Plaintiffs as class and subclass representatives and Plaintiffs' chosen counsel as Class Counsel;

(2)     Declare that the NECK-PRO headrests installed in the Class Vehicles are defective;

(3)     Declare that Mercedes is financially and otherwise responsible for notifying all Class members about the defective AHR and repair or replace, at its cost, the headrests installed in the Class Vehicles with headrests that do not have a defective AHR;

(4)     Declare that the conduct of Mercedes as alleged herein to be unlawful, deceptive, fraudulent, and unfair and issue an order temporarily and permanently enjoining Mercedes from continuing the unlawful, deceptive, fraudulent, and unfair

business practices alleged in this action;

(5)     Declare that Mercedes must disgorge, for the benefit of Plaintiffs and the Class members all or part of the ill-gotten gains they received from the sale or lease of the Class Vehicles, or make full restitution to Plaintiffs and Class members;

(6)     Award Plaintiffs and Class members actual, compensatory, and punitive remedies and damages and statutory penalties, including interest, in an amount to be proven at trial under the applicable claims;

(7)     Award Plaintiffs and Class members their reasonable attorneys' fees and costs, as allowed by law;

(8)     Award Plaintiffs and Class members pre-judgment and post-judgment interest as provided by law; and

(9)     Award Plaintiffs and Class members any further and different relief as this case may require or as determined by this Court to be just, equitable, and proper under the circumstances.

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a jury trial for any and all issues triable by a jury.

Respectfully submitted:  April 2, 2021

<u>/s/ *Michael A. Caplan*</u>                    Benjamin Widlanski

Michael A. Caplan
Georgia Bar No. 601039
T. Brandon Waddell
Georgia Bar No. 252639
**CAPLAN COBB LLP**
75 Fourteenth Street, NE, Suite 2750
Atlanta, Georgia 30309
Tel: (404) 596-5600 Fax: (404) 596-5604 mcaplan@caplancobb.com
bwaddell@caplancobb.com
*Counsel for Plaintiffs*

Florida Bar No. 1010644
bwidlanski@kttlaw.com
Harley S. Tropin
Florida Bar No. 241253
hst@kttlaw.com
Gail McQuilkin
Florida Bar No. 969338
gam@kttlaw.com
Rachel Sullivan
Florida Bar No. 815640
rs@kttlaw.com
Robert J. Neary
Florida Bar No. 81712
rn@kttlaw.com
Meaghan Goldstein
Florida Bar No. 1024796
mgoldstein@kttlaw.com
**KOZYAK TROPIN &
THROCKMORTON LLP**
2525 Ponce de Leon Blvd., 9th Floor
Coral Gables, Florida 33134
Telephone: (305) 372-1800
Facsimile: (305) 372-3508
*Counsel for Plaintiffs* (pro hac vice
applications forthcoming)

Peter Prieto
Florida Bar No. 501492
pprieto@podhurst.com
John Gravante, III
Florida Bar No. 617113
jgravante@podhurst.com
Matthew Weinshall
Florida Bar No. 84783
mweinshall@podhurst.com
Alissa Del Riego
Florida Bar No. 99742

Jack Scarola
Florida Bar No. 169440
jsx@searcylaw.com
**SEARCY DENNEY SCAROLA
BARNHART & SHIPLEY PA**
2139 Palm Beach Lakes Blvd.
West Palm Beach, Florida 33409
Telephone: (561) 686-6300
Fax: (561) 383-9451
*Counsel for Plaintiffs* (pro hac vice
application forthcoming)

adelriego@podhurst.com
**PODHURST ORSECK, P.A.**
SunTrust International Center
One S.E. 3rd Ave., Suite 2700
Miami, Florida 33131
Telephone: 305-358-2800
Facsimile: 305-358-2382
*Counsel for Plaintiffs* (pro hac vice
applications forthcoming)


Michael Burger
mike@litgrp.com
**SANTIAGO BURGER LLP**
1250 Pittsford Victor Road
Bldg. 100 Suite 190
Pittsford, New York 14534
Telephone: (585) 563-2400
Facsimile: (585) 563-7526
*Counsel for Plaintiffs* (pro hac vice
application forthcoming)

George Franjola
gfranjola@ocalalaw.com
Florida Bar No. 333271
**LAW OFFICE OF GEORGE
FRANJOLA**
3610 E. Fort King St.
Ocala, Florida 34470
Tel.: (352) 812-0462
*Counsel for Plaintiffs* (pro hac vice
application forthcoming)